**Eugene and Marie P. FIREOVED**

v.

**UNITED STATES of America.**

**Civ. A. No. 43270.**

United States District Court,
E. D. Pennsylvania.

Sept. 14, 1970.

Daniel Mungall, Jr., Philadelphia, Pa., for plaintiffs.

Warren D. Mulloy, Asst. U. S. Atty., Philadelphia, Pa., Herbert Grossman, Trial Atty., Dept. of Justice, Tax Div., Washington, D. C., for defendant.

### FINDINGS OF FACT, DISCUSSION AND CONCLUSIONS OF LAW

JOSEPH S. LORD, III, District Judge.

Plaintiffs seek the recovery of Internal Revenue taxes assessed against their income tax return for the calendar year 1959. The parties have stipulated to facts and exhibits and we make the following

### FINDINGS OF FACT

1. Plaintiff Eugene W. Fireoved ("Fireoved") and Marie P. Fireoved, husband and wife, filed a joint federal income tax return for the calendar year 1959 on or before April 15, 1960.

2. On September 18, 1962, the Internal Revenue Service assessed additional income taxes against the plaintiffs for the year 1959 in the amount of $15,-337.13. This deficiency resulted from the treatment by the Internal Revenue Service of the proceeds received by Fireoved during that year upon the redemption of 451 shares of preferred stock of Girard Business Forms Company (the "Corporation") as a taxable dividend. On March 14, 1963, the plaintiffs paid the deficiency together with interest in the amount of $2,648.00, and later, on March 10, 1965, they filed a claim for refund. The Internal Revenue Service disallowed this claim on March 8, 1966.

3. The Corporation was incorporated under the laws of Pennsylvania on November 24, 1948, under the name "Fireoved and Company, Inc.". The authorized capital stock of the Corporation was 500 shares of preferred stock, $100 par value, and 100 shares of common stock, $1 par value. Fixed, non-cumulative dividends were payable on the preferred stock before any dividend could be paid on the common stock. Only the common stock had voting power.

The purpose of the Corporation was to print and sell business forms and it has engaged in that business from that time continuously through the events related hereafter.

4. The incorporators elected the plaintiffs and Robert L. Fireoved, a nephew of Fireoved, as directors of the Corporation at the Corporation's first meeting on November 26, 1948, and these directors subsequently elected Fireoved President and Treasurer, and Marie P. Fireoved Secretary.

5. Under date of December 31, 1948, the Corporation issued the following certificates to Fireoved: certificate number 1 for 100 shares of common stock in return for $100 in cash; certificate number P–1 for 5 shares of preferred stock in return for $500 in cash; and certificate number P–2 for 60 shares of preferred stock in payment for automotive equipment, furniture and fixtures having a value of $6,000.

6. For some time before 1954, Karl G. Edelmayer and Kenneth W. Craver had been engaged in the business of printing and selling business forms as a partnership doing business under the name "Girard Business Forms Company" (the "Partnership").

7. Some time during 1954, Robert L. Fireoved indicated to Fireoved that he desired to leave the employ of the Corporation and to move to another state, as a result of which the Corporation faced the need for additional management personnel. Fireoved, Edelmayer and Craver thereafter discussed the possibility of combining their businesses, since the Partnership could provide the additional manpower which the Corporation would need, and the Partnership required additional working capital which the Corporation had and could provide. At this time, the Corporation had net tangible assets of approximately $60,000 and the Partnership had net tangible assets of approximately $30,000. Edelmayer and Craver were willing to combine the businesses but insisted that each of the individuals should have the same measure of control of the resulting business.

They were unable, however, to contribute sufficient capital in order to match Fireoved's equity in the Corporation.

8. By sometime in December of 1964, Fireoved, Edelmayer and Craver had reached an oral understanding as to the basis upon which the two businesses would be combined and the respective interests of the individuals would be reflected. Pursuant to that understanding, the following action was taken:

A. At two meetings of the directors of the Corporation duly held on December 23, 1954, amendments to the Articles of Incorporation were approved to change the name of the Corporation to "Girard Business Forms Company" and to increase the authorized preferred shares to 1,000 and the authorized common shares to 300 shares. Amendments to the By-Laws were approved to require unanimous action by all three directors, and to permit the amendment of the By-Laws by a vote of 76% of the shareholders, instead of a majority as theretofore, and to permit the directors to amend the By-Laws by unanimous vote.

These changes in the Articles of Incorporation and in the By-Laws were approved by the shareholders.

B. At a special meeting of the directors of the Corporation duly held on December 31, 1954, the following resolutions were adopted:

"RESOLVED, that the Corporation deliver to Eugene W. Fireoved, holder of all of the outstanding shares of Preferred Stock in the amount of Six Thousand five hundred dollars ($6,-500.00), the new authorized Preferred Stock in the amount of Six thousand five hundred dollars ($6,500.00) in exchange for the Preferred Stock in the amount of Six thousand five hundred dollars ($6,500.00) now held by Eugene W. Fireoved."

"FURTHER RESOLVED, that the officers of the Corporation are hereby authorized and directed to deliver to

Eugene W. Fireoved the owner of all of the outstanding stock of this Corporation 535 shares of Preferred Stock as a stock dividend of this Corporation which stock dividend is hereby declared."

C. On January 3, 1955, the Corporation entered into an Agreement for the Purchase of Property with Edelmayer and Craver, and subsequently issued the following certificates of stock to the following persons for the indicated consideration:

| Certificate, shares and kind of stock | Shareholder | Consideration |
|---|---|---|
| C–1 100 shares common | Fireoved | In exchange for certificate for 100 shares of common issued in 1948. |
| C–2 100 shares common | Edelmayer | As per Agreement of Purchase of January 3, 1955. |
| C–3 100 shares common | Craver | As per Agreement of Purchase of January 3, 1955. |
| P–1 600 shares preferred | Fireoved | In exchange for the 65 shares of preferred issued on December 31, 1948; and to represent the 535 shares authorized to be issued by the directors at meeting on December 31, 1954. |
| P–2 149 shares preferred | Edelmayer | As per Agreement of Purchase of January 3, 1955. |
| P–3 149 shares preferred | Craver | As per Agreement of Purchase of January 3, 1955. |

D. On the same day, Fireoved, Edelmayer and Craver, as shareholders of the Corporation, entered into a written agreement relating to the transfer of shares upon the death of any shareholder. The Corporation also entered into separate written one-year employment contracts with Fireoved, Edelmayer and Craver. With some minor adjustments not relevant here, these employment contracts were renewed every year at issue in this suit.

9. Upon the completion of the steps described above, the Corporation's stock was held by its shareholders as follows:

| Shareholder | Preferred Shares | Common Shares |
|---|---|---|
| Fireoved | 600 | 100 |
| Edelmayer | 149 | 100 |
| Craver | 149 | 100 |
| Totals | 898 | 300 |

Voting control of the Corporation and the equity in the future earnings and growth of the company beyond the 5% cumulative dividends payable on the preferred stock were represented by the common stock, one-third of which was owned by each of the three individuals.

10. At the beginning of the taxable year in which the 535 shares of preferred stock were issued to Fireoved in accordance with the resolution adopted by the directors of the Corporation at their meeting on December 31, 1954, the amount of accumulated earnings and profits of the Corporation was $52,993.-06. The earnings and profits of the Corporation for that taxable year were $14,185.84.

11. On February 28, 1958, Fireoved and Craver each sold 24 shares of common stock in the Corporation to Edelmayer.

12. On April 30, 1959, the Corporation redeemed 451 shares of the preferred stock held by Fireoved at $105 per share. The proceeds of this redemption totaling $47,355 were treated by Fireoved in the joint federal income tax return for that taxable year as a long term capital gain. The Internal Revenue Service treated the proceeds as ordinary income and this resulted in the deficiency of $15,337.13.

13. At the beginning of the taxable year in which Fireoved's 451 shares of preferred stock of the Corporation were redeemed, the total amount of accumulated earnings and profits of the Corporation was $48,235. The total amount of current earnings and profits of the Corporation for the taxable year in which the preferred stock was redeemed was $13,568.69.

14. No dividends, except as indicated, were paid by the Corporation during the taxable years in which the preferred stock was originally issued to Fireoved as described in paragraphs 5, 8B and 8C, *supra*. No dividends were paid by the Corporation during the taxable year in which the 451 shares of preferred stock

were redeemed as described in paragraph 12 above.

## DISCUSSION

The government maintains that the preferred stock issued to Fireoved in 1954 was section 306 stock [1] and that its redemption in 1959 therefore gave rise to ordinary income. Fireoved, of course, contends otherwise, arguing that the redemption of those shares was a sale or exchange of a capital asset entitled to capital gains treatment.

Section 306 was enacted in the 1954 Code to plug the loophole commonly known as the "preferred stock bailout" which received attention following the decision in Chamberlin v. Commissioner of Internal Revenue, 207 F.2d 462 (C.A. 6, 1953), cert. denied, 347 U.S. 918, 74 S.Ct. 516, 98 L.Ed. 1073 (1954). In *Chamberlin,* a closely held corporation which had only common stock outstanding issued a dividend of preferred stock, which was to be redeemed periodically over eight years, with a total par value of $802,000, and transferred that amount from earned surplus to capital account. Within a few days the preferred stock was sold by the shareholders to an insurance company in accordance with arrangements made before the dividend was declared or the stockholders had received the stock dividend. The Sixth Circuit reversed the Tax Court's holding that the sale resulted in ordinary income to the shareholders, and held that the sale resulted in capital gain. The result was a very successful tax avoidance scheme. If cash had been distributed as a dividend, rather than stock, the amount distributed would have been a dividend, taxable at ordinary income rates. But because stock, instead of cash, was issued as a dividend, no immediate tax was payable, and since the stock was then sold to a third party, the Court held that the proceeds received constituted capital gain. Since the purchaser of the stock was in all probability to have it re-

deemed pursuant to a plan in which all of its holdings in the Corporation were to be liquidated it too would not have the redemption proceeds included in its income as a taxable dividend. See § 302 (b) (3). Even if they were to be treated as a taxable dividend, the purchaser, a corporation, would be entitled to the 85% dividends received deduction or credit, and would pay very little tax. See § 243.

█ Thus, what Congress was trying to prevent by enacting § 306 was the "bailout" of earnings and profits at capital gains rates through the issuance of a preferred stock dividend. The use of preferred stock as a stock dividend permitted the Corporation, when it had earnings and profits, to grant a right to those earnings superior to that enjoyed by common stock, but at the same time not relinquish any voting control of the Corporation. The newly issued preferred stock could be freely transferred to someone who would not receive any corporate control but who could later withdraw the earnings of the Corporation (represented by the redemption value of the preferred stock) in preference to the common stockholders.

## I

Application of the punitive provisions of § 306 to the case before us begins with § 306(a) (2), which provides that when stock falling within any of the definitions of "section 306 stock" is redeemed, "the amount realized shall be treated as a distribution of property to which section 301 applies." There is no dispute that if the shares redeemed in 1959 are section 306 stock, section 301 would subject the entire proceeds to ordinary income tax treatment, since the Corporation had more than sufficient earnings and profits at both the distribution and redemption of the preferred shares. §§ 301(c) (1), 316(a); see § 306(c) (2). The government maintains that the preferred shares at issue are

---

1. All citations are to Title 26, United States Code, the Internal Revenue Code of 1954.

section 306 stock under either of two definitional sections.

First, it maintains that the preferred shares received in 1954 fall within § 306(c) (1) (A), which defines section 306 stock as

"Stock (other than common stock issued with respect to common stock) which was distributed to the shareholder selling or otherwise disposing of such stock if, by reason of section 305(a), any part of such distribution was not includible in the gross income of the shareholder."

Under § 305(a), "gross income does not include the amount of any distribution made by a corporation to its shareholders, with respect to the stock of such corporation, in its stock * * *." Thus, the argument goes, when the Corporation declared "a stock dividend" on December 31, 1954, and issued new preferred shares to Fireoved, he did not include any of the new shares in his gross income by virtue of § 305(a) and the new shares of preferred are therefore section 306 stock. Moreover, the government contends that the entire block of 600 shares Fireoved received in 1954 constitutes section 306 stock, even though 65 of those shares represented an exchange of his original holding of preferred for which he paid consideration in 1948. The only apparent reason the government has for treating these 65 shares as section 306 stock is that when Fireoved exchanged his 65 shares of old preferred for 65 shares of new preferred he also received the "stock dividend" of 535 shares of preferred, and both blocks of stock were evidenced by one certificate. This one certificate, the argument seems to run, transformed the transaction into one "distribution," and since, under § 306(c) (1) (A), "any part [namely the stock dividend] of such distribution" was not included in Fireoved's gross income, the entire "distribution" becomes section 306 stock. Surely if Fireoved had received two certificates, one for 65 shares and one for 535 shares, 65 shares of the new preferred would not have been a "distribution made by a corpo-

ration * * * with respect to [its] stock" within the meaning of § 305(a). Rather, they would very obviously have been, as they should now be considered, subject to the non-recognition provisions of § 354(a) (1) since those 65 shares were received pursuant to a plan of reorganization under § 368(a), namely, a recapitalization, § 368(a) (1) (E). To argue that the use of the one stock certificate to evidence two different blocks of stock merges both blocks of stock into one "distribution" under § 306(a) (1) (A) even though part of the "distribution" is an "exchange" subject to the non-recognition provided by § 354 (a) (1), not the non-recognition of a distribution under § 305(a), is to indulge in the epithetical elevation of form over substance.

Fireoved therefore argues that, at the very least, 65 of the 451 shares of preferred redeemed in 1959 should be subject to the application of the Commissioner's regulations pertaining to the disposition of stock acquired at different times, 26 C.F.R. § 1.1012–1(c) (essentially tax treatment on a "first-in, first-out" basis). Thus, 65 of the shares redeemed in 1959 should be considered the 65 shares of new preferred Fireoved received in 1954 in exchange for his 65 shares of the original preferred, and hence at least these 65 shares are not subject to § 306 treatment. We agree.

Not unexpectedly dissatisfied with preventing § 306 treatment to only 65 of the 451 shares redeemed in 1959, Fireoved disputes the applicability of § 306(a) (1) (A). He makes this argument despite the fact that the December 31, 1954, resolution authorizing issuance of the 535 shares of preferred stock refers to the stock as "a stock dividend." Such a stock distribution is, of course, covered by § 305(a), and hence § 306(a) (1) (A). Even granting taxpayer is right to ignore the form of the transaction and argue its substantive characteristics, we think he is no better off elsewhere in § 306.

Fireoved argues that his receipt of the "stock dividend" of preferred was part

and parcel of the Corporation's reorganization preparatory to its purchase of the partnership. He points out that Edelmayer and Craver insisted on equal voting control of the Corporation even though they together had only half the assets that Fireoved's corporation contained. This meant that in order to reflect Fireoved's far greater "capital," admittedly accumulated earnings and profits, it was necessary to distribute to Fireoved some evidence of this greater worth other than through the issuance of common stock. The use of non-voting preferred was only a convenient method of recapitalizing the Corporation in a way that would accurately reflect the shareholder's investments.

While Fireoved never makes the argument explicit, we assume that he wants us to view the transaction as one in which the Corporation issued 9.2304 shares of new preferred for each outstanding share of the old preferred. Thus, when the Corporation increased its authorized capital stock on December 31, 1954, from $50,100 to $100,300 (representing an increase in the number of common shares, par value $1, from 100 to 300, and an increase in the number of preferred shares, par value $100, from 500 to 1,-000), and issued a total of 600 shares of preferred to Fireoved in exchange for his old preferred, all that really happened was that the Corporation effected a "recapitalization" within § 368(a) (1) (E), as is evidenced by the acquisition of the partnership three days later when Edelmayer and Craver received an amount of common stock equal to Fireoved's and an amount of preferred smaller than Fireoved's which represented their lesser contributions of capital and assets.

Even if Fireoved received the preferred pursuant to a recapitalization, hence a reorganization under § 368(a) (1) (E), the government maintains it is still section 306 stock by virtue of § 306 (c) (1) (B), which defines section 306 stock as

Stock which is not common stock and

(i) which was received, by the stockholder selling or otherwise disposing of such stock, in pursuance of a plan of reorganization (within the meaning of section 368(a)) * * *, and

(ii) with respect to the receipt of which gain or loss to the shareholder was to any extent not recognized by reason of part III, but only to the extent that either the effect of the transaction was substantially the same as the receipt of a stock dividend, or the stock was received in exchange for section 306 stock."

The government's position with respect to subparagraph (B) is straightforward. At the time of the recapitalization and acquisition of the partnership, the Corporation had accumulated earnings and profits of $52,993.06, and current earnings and profits of $14,185.84, or a total of $67,178.90. Fireoved received 600 shares of preferred stock, par value $100, redemption value 30 days after issuance of $105, with a face value of $60,000 and worth $63,000 on redemption. If Fireoved had received cash in that amount, in lieu of the preferred stock, he would have received a taxable dividend, and therefore the preferred stock constituted a stock dividend. Rev. Rule 56–586, 1956–2 Cum.Bull. 214. Thus, his receipt of the preferred stock was "substantially the same as the receipt of a stock dividend," § 306(c) (1) (B) (ii), and the preferred stock constituted section 306 stock.

Fireoved makes no convincing argument why, even if what he meant to do in 1954 was recapitalize the Corporation and not declare, as he did, a stock dividend, the additional value he received was not substantially the same as the receipt of stock dividend. He argues that there must be some meaningful difference between subparagraph (A) and (B) and that a markedly different test must be applied to preferred received in a reorganization. But conceiving of a great difference between the Corporation's denomination of certain stock as "a stock dividend" and the Corporation's issuance of preferred representing the

same corporate assets, namely, earnings and profits, in a transaction denominated a "recapitalization," is precisely the kind of a formal distinction Congress sought to avoid by using the phrase "substantially the same as the receipt of a stock dividend." *See* S.Rep. No. 1622, 83d Cong., 2d Sess. 241 (1954). We are not very impressed with an argument that a corporate transaction whose nominal form, chosen by the taxpayer, qualifies stock received pursuant thereto for § 306 treatment under subparagraph (A) should void § 306 treatment if it can be conceptualized as fitting under subparagraph (B). Fireoved received 535 shares of preferred over and above the 65 shares of old preferred he exchanged for new preferred. Because the par and redemption value of the new shares were the same as the old, he received an additional share of the earnings and profits valued at $53,500 face value, $56,175.00 on redemption. This substantial increment in the value of his holdings represented nothing but his share of earnings and profits on which he as shareholder had never paid any tax, unlike the capital contributions of Edelmayer and Craver. Further, this distribution occurred when he was the sole shareholder. In United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970), the Court held that when a sole stockholder causes part of his shares to be redeemed by the corporation, such a redemption is *always* "essentially equivalent to a dividend" and hence will receive ordinary income tax treatment. § 302(b) (1). Here we are *concerned with the distribution of ad*ditional preferred stock by the Corporation at a time when Fireoved was the sole shareholder. We have considerable

difficulty conceiving of a situation where such a distribution, when there are sufficient earnings and profits, is not "substantially the same as the receipt of a stock dividend" within the meaning of § 306(c) (1) (B) and hence is not section 306 stock. *Cf. Davis, supra.*

■ Thus, in our view, it does not matter a great deal which subparagraph of § 306(a) (1), (A) or (B), is viewed as applicable to this transaction. Under either, Fireoved distributed earnings and profits to himself in the form of preferred stock, and this distribution constituted a stock dividend if the Corporate resolution is to be believed, or its effect was substantially the same as the receipt of a stock dividend if the transaction be considered a recapitalization.

Once again, however, the government maintains that all 600 shares of preferred issued in 1954 qualify as section 306 stock. The government agrees, as it must, that the 65 shares of original preferred exchanged for the new were not section 306 stock, but contends that these shares were "upgraded"[2] to section 306 stock by the reorganization in 1954. An example given in the regulations for § 306(c) (1) (B) provides the government with the springboard for its argument:

"*Example* (2). X and Y each own one-half of the 2,000 outstanding shares of preferred stock and one-half of the 2,000 outstanding shares of common stock of Corporation C. Pursuant to a reorganization within the meaning of section 368(a) (1) (E) (recapitalization) each shareholder exchanges his preferred stock for preferred stock of a new issue which is not substantially different from the preferred stock

---

2. The notion that stock can be "upgraded" was evidently spawned by the provisions of the Code, § 306(c) (1) (B), permitting section 306 stock to be "downgraded" by exchanging it for stock of the corporation which does not possess the preference the preferred stock had to the earnings of the corporation. The purpose of this provision was, says the Senate Report, to permit the shareholder "an opportunity to downgrade preferred

stock characterized as section 306 stock in his hands by causing a recapitalization and exchange of such stock for common stock." S.Rep.No.1622, 83d Cong., 2d Sess. 244 (1954) U.S.Code Cong. & Admin.News, p. 4881. Other than the textual discussion of the Regulation, *supra*, the government cites no authority for its proposition that stock can be "upgraded."

previously held. Unless the preferred stock exchanged was itself section 306 stock the preferred stock received is not section 306 stock."

■ The government argues, naturally, that the new preferred Fireoved received for his old preferred *was* "substantially different" in that a noncumulative preferred stock that would share in dividends, share-for-share, with the common stock after the declaration of 5% dividends on the preferred stock and $5 per share on the common stock, was changed into a *cumulative* 5% preferred stock that had no further participation in earnings. This argument ignores the fact that, in order to be consistent with § 306, the "substantial difference" contemplated by the regulation must mean a difference which permits the newly issued preferred to effect the bailout of earnings and profits which § 306 was designed to prevent, *i. e.*, a difference permitting the new preferred to share in accumulated earnings and profits to an extent that the old preferred was unable to share in them. The only difference in the newly issued preferred is that its *future* share of earnings and profits became a fixed, assured preference. The 65 new shares of preferred issued in exchange for the old preferred possessed no greater claim to accumulated earnings and profits than did the 65 shares of the original preferred: par value remained $100 per share, and redemption value, $105 per share. We conclude that the 65 shares of new preferred exchanged for the 65 shares of original preferred were "not substantially different from the preferred stock previously held," and those 65 shares are therefore not section 306 stock.

Again applying the Commissioner's regulations providing for treatment of these shares on a first-in, first-out basis, 65 of the 451 shares redeemed in 1959 should be considered the 65 shares of new preferred exchanged for Fireoved's 65 shares of old preferred and hence are not subject to § 306 treatment.

■ Fireoved's last argument is that his receipt of the remaining 386 shares of preferred was "not substantially the same as the receipt of a stock dividend" because subparagraph (B) permits the kind of reorganization that occurred here since it carves out an exception to (A) for such business reorganizations. He contends that he could have liquidated the Corporation, received capital gains treatment on all his earnings and profits, and then contributed his capital to a new corporation along with Edelmayer and Craver and he obviously would have escaped any ordinary income tax treatment. He concludes that since what he did was different only in form, § 306(c) (1) (B) was designed to permit corporate reorganizations of this type without the necessity for such business interruptions as a liquidation. The government counters that the earnings could not have been distributed in this manner because the transaction would have constituted a liquidation-reincorporation, and the earnings and profits would have been taxable as a dividend because of this distribution of "boot" under § 356(a). Fireoved replies that, under the plan as agreed upon and executed, he would not have owned more than 80% of the common stock of the resulting corporation and thus would not have committed the error of a liquidation-reincorporation, citing Berghash v. Commissioner of Internal Revenue, 43 T.C. 743 (1965); Gallagher v. Commissioner of Internal Revenue, 39 T.C. 144 (1962), and he would simply have recognized a capital gain in 1954 instead of 1959. While this hypothetical debate is instructive, the fact that Fireoved could have structured his transaction differently and might have recognized capital gain in 1954, instead of recognizing no gain of any kind as happened, does not answer the question whether what he did created section 306 stock. As the Supreme Court stated in *Davis, supra,* " * * * the difference between form and substance in the tax law is largely problematical, and taxpayer's complaints have little to do * * * " with whether Fireoved's desire to grant equal voting control to himself, Edelmayer and Craver forced him into

the issuance of section 306 stock. Moreover, there are strong policy reasons behind permitting capital gains treatment to the withdrawal of earnings and profits when a complete liquidation occurs. For reasons sufficient unto himself, Fireoved chose not to liquidate his business and recognize his gain in 1954. If he had done so, his tax consequences might well be different. But he will not be heard to argue that because he would not have issued a stock dividend to himself if he had liquidated, that he also did not issue one when he didn't liquidate.

## II

Finally, Fireoved argues that even if the 535 shares of preferred issued in 1954 are section 306 stock, he can escape § 306 treatment because he qualifies for an exception to § 306, namely, § 306(b)(4). This section provides that even though the stock is section 306 stock, § 306's punitive taxation will not be applied

"[i]f it is established to the satisfaction of the Secretary or his delegate—

(A) that the distribution, and the disposition or redemption, or

(B) in the case of a prior or simultaneous disposition (or redemption) of the stock with respect to which the section 306 stock disposed of (or redeemed) was issued, that the disposition (or redemption) of the section 306 stock,

was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax."

Fireoved argues that 386 (451 less 65) of the shares redeemed in 1959 were not distributed and redeemed in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax, and that all 386 shares qualify under subparagraph (A) of § 306(b)(4).

There is no judicial authority interpreting the provision that "the Secretary must be satisfied," nor do the reports of the Senate Finance Committee and the House Ways and Means Committee concerning the adoption of this provision provide any additional insight into this requirement. Mertens says that

" * * * it is questionable whether this confers any greater prerogative or discretion on the Commissioner than normally resides in him with respect to the usual kind of determination which first is made on the administrative level and which receives a presumption of correctness." 3B J. Mertens, Federal Income Taxation, § 22.90 (1966).

At all events, even granting the Commissioner this presumption of correctness, the government has not argued that, even assuming the Commissioner made such a determination (and nothing in the record before us indicates that he did), Fireoved is in any way prevented from arguing its invalidity.

Fireoved's main argument is that the preferred shares only evidenced capital the parties agreed was needed by the Corporation, and because this need for the retention of capital constituted a business purpose, one of the principal purposes of the shareholder's plan was not the avoidance of income tax. We disagree. In the first place, there is no evidence in this record of any need to retain capital after 1954. The record is equally consistent with the proposition that the capital was left in the Corporation because *Fireoved* did *not* need it or want it. Secondly, only *"one* of [the] principal purposes"* (emphasis added) of the distribution need be tax avoidance, and we think it clear that even if one of the other reasons Fireoved left the earnings and profits in the Corporation was bona fide, one of the principal reasons Fireoved left them in the Corporation and evidenced his right to them by issuing preferred stock to himself *was* to avoid tax on those earnings and profits. This does not mean, however, that all 386 shares should receive § 306 treatment.

Under subparagraph (B) of § 306(b)(4), when there has been a prior disposition of the stock with respect to which the section 306 stock was issued, the exception may be satisfied more easily

144

because the taxpayer need only show that the *redemption* of the section 306 stock was not pursuant to a tax-avoidance scheme. Whether the original distribution of the section 306 stock is tainted is irrelevant. The regulation to this provision, 26 C.F.R. § 1.306–2(b) (3), provides that if the shareholder disposes of his voting common stock before he disposes of his preferred stock, "the subsequent disposition of his preferred stock *would not ordinarily* be considered a disposition with a principal purpose of avoiding Federal income tax." (Emphasis added.) The regulation does not require a business purpose where there is a previous disposition of the common stock with respect to which the section 306 stock was issued—a proper business purpose is presumed unless there is some positive evidence to the contrary. We agree with Fireoved that there is nothing in this record to indicate that this case should not be treated in accordance with the regulations.

In 1958, Fireoved sold 24 of his 100 shares of voting common stock to Edelmayer, apparently as part of a plan to shift eventual control of the Corporation to Edelmayer. The redemption of the preferred shares of stock took place in 1959, after the sale of the common stock and pursuant to a plan to equalize the preferred shareholdings of the shareholders, a plan requiring the approval of all three shareholders: Edelmayer, Craver and Fireoved, then only a minority shareholder. According to the regulations and § 306(b) (4) (B), the disposition of 24% of the preferred stock should not be considered a disposition having a tax-avoidance purpose.

■ The government contends that § 306(b) (4) (B) applies only to situations where the shareholder disposes of *all* his common stock before any disposition of his section 306 stock. However, this interpretation renders the subparagraph superfluous since this situation is already covered by § 306(b) (1). In order to give § 306(b) (4) (B) a reading which makes it a meaningful section, it must apply to partial as well as complete dispositions of the common stock with

respect to which the section 306 stock was issued. *See* 3B Mertens, Federal Income Taxation, § 22.90 (1966).

■ A reasonable interpretation of the exceptions set forth in § 306(b) is that Congress intended to preserve capital gain treatment for redemptions in cases involving the sale or disposition of both the common stock and the preferred which would have otherwise resulted in the treatment of the proceeds as capital gain if issuance of the preferred had not occurred. Since § 306 was designed to prevent the bailout of earnings and profits at capital gains rates, a taxpayer should not be allowed to sell his interest in the accumulated earnings and profits without affecting his underlying equity interest in the corporation. Analogized to the "fruit-of-the-tree" doctrine enunciated in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930), the preferred stock is fruit, and the common, the tree. If a disposition or a redemption of the fruit alone occurs, ordinary income tax treatment is appropriate. But where there is a prior disposition or redemption of the common stock followed by a disposition or redemption of the preferred, § 306(b) (4) provides, in effect, that the fruit should be treated as though it had not been separated from the tree by the issuance of the section 306 stock. Thus, we cannot agree with the government that Fireoved did not give up anything of consequence when he sold 24 shares of common stock in 1958. It is true that Fireoved retained approximately 25% of the outstanding shares of common stock, and that he therefore retained an effective veto over the Corporation—the By-Laws required either a unanimous vote of all three directors or a vote of 76% of the shareholders for either corporate resolutions or amendments of the By-Laws—and to that degree he did not relinquish a vital measure of control over the Corporation. However, this argument fails to consider the impact of the Senate Report:

"Subparagraph (B) of subsections (b) (4) applies to a case where the shareholder has made a prior or

simultaneous disposition (or redemption) of the underlying stock with respect to which the section 306 stock was issued. Thus if a shareholder received a distribution of 100 shares of section 306 stock on his holdings of his 100 shares of voting common stock in a corporation and sells his voting common stock before he disposes of his section 306 stock, the subsequent disposition of his section 306 stock would not ordinarily be considered a tax avoidance disposition since he has previously parted *with the stock which allows him to participate in the ownership of the business.* * * * " S.Rep. No. 1622, 83d Cong., 2d Sess. 244 (1954); U.S.Code Cong. & Admin. News, p. 4881. (Emphasis added.)

If Fireoved had disposed of a few more shares, as the government's argument implies he must in order to qualify for § 306(b) (4)'s exception, he would not have disposed of anything more than his veto power, no small matter to be sure, but he would still have retained a substantial "ownership interest" in the Corporation, namely, his equity holdings. Since Fireoved disposed of 24% of his common stock holdings in 1958, thereby reducing by that percentage his share of any future equity appreciation, 24% of the section 306 stock he received in 1954 should be excluded by virtue of § 306(b) (4) (B). Twenty-four per cent of 535 is approximately 128 shares.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter. 28 U.S.C. § 1346(a).

2. Five hundred and thirty-five (535) shares of the six hundred (600) shares of preferred stock issued to Fireoved in 1954 constitute section 306 stock.

3. The proceeds from the redemption of two hundred and fifty-eight (258) shares of preferred stock in 1959 should be taxed at ordinary income rates.

4. The proceeds from the redemption of one hundred and twenty-eight (128) shares of preferred stock in 1959 should be taxed at capital gains rates.