**Eugene W. and Marie P. FIREOVED,**
**Appellants in Nos. 71–1565**

**v.**

**UNITED STATES of America,**
**Appellant in Nos. 71.–1566,**
**71–1567.**

**Nos. 71–1565 to 71–1567.**

United States Court of Appeals,
Third Circuit.

Argued April 21, 1972.

Decided June 8, 1972.

Daniel Mungall, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellants in No. 71–1565 and cross-appellees in Nos. 71–1566/7.

Janet Spragens, Department of Justice-Tax Division, Washington, D.C. for appellee in No. 71–1565 and cross appellants in Nos. 71–1566/7.

Before ADAMS, MAX ROSENN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal calls into question the application of section 306 of the Internal Revenue Code of 1954[1] and the "first in-first out rule"[2] to a redemption of preferred stock in a corporation by plaintiff,[3] one of its principal shareholders. In particular we are asked to decide whether the transaction here had "as one of its principal purposes the avoidance of Federal income tax,"[4] whether a prior sale of a portion of the underlying common stock immunized a like proportion of the section 306 stock from treatment as a noncapital asset[5] and whether another block of the redeemed stock should be considered to represent stock not subject to section 306.

### I. Factual Background

On November 24, 1948, Fireoved and Company, Inc. was incorporated for the purpose of printing and selling business forms. At their first meeting, the incorporators elected Eugene Fireoved, his wife, Marie, the plaintiffs, and a newphew, Robert L. Fireoved, as directors of the corporation. Subsequently, the directors elected Eugene Fireoved as President and Treasurer and Marie Fireoved as Secretary. The corporation had authorized capital stock of 500 shares of $100 par value non-voting, non-cumulative preferred stock and 100 shares of $1 par value voting common stock. On December 31, 1948, in consideration for $100 cash, the corporation issued Eugene Fireoved 100 shares of common stock; for $500 cash, it issued him five shares of preferred stock; and in payment for automotive equipment and furniture and fixtures, valued at

---

1. 26 U.S.C. § 306.

2. Treas.Reg. § 1.1012–1(c).

3. Marie Fireoved is a plaintiff here only because she filed a joint return with her husband in the year in question.

4. 26 U.S.C. § 306(b) (4) (A).

5. 26 U.S.C. § 306(b) (4) (B).

$6,000, it issued him an additional 60 shares of preferred stock.

In 1954, when Mr. Fireoved learned that his nephew, Robert, was planning to leave the business, he began discussions with Karl Edelmayer and Kenneth Craver concerning the possibility of combining his business with their partnership, Girard Business Forms, that had been printing and selling business forms for some time prior to 1954. Messrs. Fireoved, Edelmayer and Craver agreed that voting control of the new enterprise should be divided equally among the three of them. Because Mr. Fireoved's contribution to capital would be approximately $60,000 whereas the partnership could contribute only $30,000, it was decided that preferred stock should be issued to Mr. Fireoved to compensate for the disparity. In furtherance of this plan, the directors and shareholders of Fireoved and Company, in late 1954 and early 1955, held several meetings at which the following corporate changes were accomplished: The name of the company was changed to Girard Business Forms; the authorized common stock was increased from 100 to 300 shares and the authorized preferred stock was increased to 1000 shares; Mr. Fireoved exchanged his 100 shares of common and 65 shares of preferred stock for equal amounts of the new stock; an agreement of purchase was authorized by which the company would buy all the assets of the Edelmayer-Craver partnership in return for 200 shares of common and 298 shares of preferred stock; and Mr. Fireoved was issued 535 shares of the new preferred stock as a dividend [6] on his 100 shares of common stock, thereby bringing his total holding of preferred stock to 600 shares to indicate his $60,000 capital contribution compared to the $29,800 contributed by the former partnership.

As the business progressed, Mr. Edelmayer demanded more control of the company. In response, Mr. Fireoved and Mr. Craver each sold 24 shares of common stock in the corporation to him on February 28, 1958.

On April 30, 1959, the company redeemed 451 of Mr. Fireoved's 600 shares of preferred stock at $105 per share, resulting in net proceeds to him of $47,355.[7] The gain from this transaction was reported by Mr. and Mrs. Fireoved on their joint return for the year 1959 as a long term capital gain. Subsequently, the Commissioner of Internal Revenue (Commissioner) assessed a deficiency against the Fireoveds of $15,337.13 based on the Commissioner's view that the proceeds from the redemption of the 451 shares of preferred stock should have been reported as ordinary income and the tax paid at that rate based on section 306. Mr. and Mrs. Fireoved paid the assessment on March 14, 1963, but on March 10, 1965, filed a claim for a refund with the Commissioner.

After the Commissioner disallowed the refund claim on March 8, 1966, the Fireoveds instituted the present action against the United States on August 4, 1967 seeking a refund of the $15,337.13 plus interest on the ground that the transaction came within an exception to section 306, and that they were therefore entitled to report the income as a long term capital gain. The case was tried to the court without a jury on stipulated facts. It is from the district court's determination, 318 F.Supp. 133, on October 29, 1970, that $8,885.50 should be refunded to the taxpayers that both parties appeal.

## II. Background of Section 306

Because we are the first court of appeals asked to decide questions of law pursuant to section 306, it is appropriate that we first examine the circumstances that led to the inclusion in 1954 of this section in the Code.

6. At the time Mr. Fireoved received his stock dividend, the company had accumulated earnings and profits of $52,993.06.

7. In 1959, the company had accumulated earnings and profits of $48,235.

Generally, a taxpayer will benefit monetarily if he is able to report income as a long term capital gain rather than as ordinary income. Under normal circumstances a cash dividend from a corporation constitutes ordinary income to the shareholder receiving such money. Therefore, it would be to the advantage of a shareholder if a method could be devised by which the money could be distributed to him, that would otherwise be paid out as cash dividends, in a form that would permit the shareholder to report such income as a long term capital gain.

A temporarily successful plan for converting ordinary income to long term capital gain is described by the facts of Chamberlin v. C. I. R., 207 F.2d 462 (6th Cir. 1953). There a close corporation had assets of $2.5 million, approximately half of which were in the form of cash and government securities. To have distributed the cash not required in the operation of the business to the shareholders as a dividend would have subjected them to taxation at ordinary income rates. The corporation therefore amended its charter to authorize 8,020 shares of preferred stock to be issued to the shareholders as a dividend on their common stock. The accounts of the corporation were adjusted by transferring $802,000 from earned surplus to the cap-

ital account. While these corporate changes were taking place, negotiations occurred between the shareholders and two insurance companies for the purchase of the newly issued preferred stock. In addition, the corporation constructed a timetable for retirement of the preferred stock, which proved satisfactory to the purchasing companies. When the transaction was completed, the selling shareholders reported the gain they realized from the sale of the preferred stock to the insurance companies as a long-term gain from the disposition of a capital asset. The Commissioner contended that the gain should have been reported as ordinary income and accordingly assessed a deficiency against the selling shareholders. The Tax Court agreed with the Commissioner. On review, the Sixth Circuit reversed, holding for the taxpayer thus giving the approval of a federal court to what has been termed "a preferred stock bail-out."

The legislative reaction to the *Chamberlin* decision was almost immediate, resulting in the addition of section 306 to the 1954 Code, in order to prevent shareholders from obtaining the tax advantage of such bail-outs when such shareholders retain their ownership interests in the company.

Section 306 is set out in full in the margin,[8] but may be briefly summarized

---

8. § 306. Dispositions of certain stock
   (a) General rule.—If a shareholder sells or otherwise disposes of section 306 stock (as defined in subsection (c))—
   (1) Dispositions other than redemptions.—If such disposition is not a redemption (within the meaning of section 317(b))—
   (A) The amount realized shall be treated as gain from the sale of property which is not a capital asset. This subparagraph shall not apply to the extent that—
   (i) the amount realized, exceeds
   (ii) such stock's ratable share of the amount which would have been a dividend at the time of distribution if (in lieu of section 306 stock) the corporation had distributed money in an amount equal to the fair market value of the stock at the time of distribution.
   (B) Any excess of the amount realized over the sum of—

   (i) the amount treated under subparagraph (A) as gain from the sale of property which is not a capital asset, plus
   (ii) the adjusted basis of the stock, shall be treated as gain from the sale of such stock.
   (C) No loss shall be recognized.
   (2) Redemption.—If the disposition is a redemption, the amount realized shall be treated as a distribution of property to which section 301 applies.
   (b) Exceptions.—Subsection (a) shall not apply—
   (1) Termination of shareholder's interest.—
   (A) Not in redemption.—If the disposition—
   (i) is not a redemption;
   (ii) is not, directly or indirectly, to a person the ownership of whose stock would (under section 318(a)) be attributable to the shareholder; and

(iii) terminates the entire stock interest of the shareholder in the corporation (and for purposes of this clause, section 318 (a) shall apply).

(B) In redemption.—If the disposition is a redemption and section 302(b) (3) applies.

(2) Liquidations.—If the section 306 stock is redeemed in a distribution in partial or complete liquidation to which part II (sec. 331 and following) applies.

(3) Where gain or loss is not recognized.—To the extent that, under any provision of this subtitle, gain or loss to the shareholder is not recognized with respect to the disposition of the section 306 stock.

(4) Transactions not in avoidance.— If it is established to the satisfaction of the Secretary or his delegate—

(A) that the distribution, and the disposition or redemption, or

(B) in the case of a prior or simultaneous disposition (or redemption) of the stock with respect to which the section 306 stock disposed of (or redeemed) was issued, that the disposition (or redemption) of the section 306 stock,

was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax.

(c) Section 306 stock defined.—

(1) In general.—For purposes of this subchapter, the term "section 306 stock" means stock which meets the requirements of subparagraph (A), (B), or (C) of this paragraph.

(A) Distributed to seller.—Stock (other than common stock issued with respect to common stock) which was distributed to the shareholder selling or otherwise disposing of such stock if, by reason of section 305(a), any part of such distribution was not includible in the gross income of the shareholder.

(B) Received in a corporate reorganization or separation.—Stock which is not common stock and—

(i) which was received, by the shareholder selling or otherwise disposing of such stock, in pursuance of a plan of reorganization (within the meaning of section 368(a)), or in a distribution or exchange to which section 355 (or so much of section 356 as relates to section 355) applied, and

(ii) with respect to the receipt of which gain or loss to the shareholder was to any extent not recognized by reason of part III, but only to the extent that either the effect of the transaction was substantially the same as the receipt of a stock dividend, or the stock was received in exchange for section 306 stock.

For purposes of this section, a receipt of stock to which the foregoing provisions of this subparagraph apply shall be treated as a distribution of stock.

(C) Stock having transferred or substituted basis.—Except as otherwise provided in subparagraph (B), stock the basis of which (in the hands of the shareholder selling or otherwise disposing of such stock) is determined by reference to the basis (in the hands of such shareholder or any other person) of section 306 stock.

(2) Exception where no earnings and profits.—For purposes of this section, the term "section 306 stock" does not include any stock no part of the distribution of which would have been a dividend at the time of the distribution if money had been distributed in lieu of the stock.

(d) Stock rights.—For purposes of this section—

(1) stock rights shall be treated as stock, and

(2) stock acquired through the exercise of stock rights shall be treated as stock distributed at the time of the distribution of the stock rights, to the extent of the fair market value of such rights at the time of the distribution.

(e) Convertible stock.—For purposes of subsection (c)—

(1) if section 306 stock was issued with respect to common stock and later such section 306 stock is exchanged for common stock in the same corporation (whether or not such exchange is pursuant to a conversion privilege contained in the section 306 stock), then (except as provided in paragraph (2)) the common stock so received shall not be treated as section 306 stock; and

(2) common stock with respect to which there is a privilege of converting into stock other than common stock (or into property), whether or not the conversion privilege is contained in such stock, shall not be treated as common stock.

(f) Source of gain.—The amount treated under subsection (a) (1) (A) as gain from the sale of property which is not a capital asset shall, for purposes of part I of subchapter N (sec. 861 and following, relating to determination of sources of income), be treated as derived from the same source as would have been the source if money had been received from the corporation as a dividend at the time of the distribution of such stock. If under the preceding sentence such amount is determined to be derived from sources within the United States, such amount shall be considered to be fixed or determinable annual or periodical gains, profits, and income within the meaning of

as it relates to this case: For tax purposes, Congress created a new type of stock known as section 306 stock. When a corporation having accumulated or retained earnings and profits issues a stock dividend which is not otherwise subject to taxation at the time of issuance (other than common on common), the stock received is section 306 stock. The effect of owning such stock is that on its redemption, if the corporation has sufficient retained earnings at that time, the gain is taxed at ordinary income rates while any loss resulting may not be recognized for federal tax purposes. Section 306(b) sets forth several exceptions to the general rule which serve to remove the section 306 taint from stock disposed of under those circumstances.

Based on the history of section 306 and its plain meaning evidenced by the provisions, it is not disputed that the 535 shares of preferred stock issued to Mr. Fireoved as a stock dividend in 1954 were section 306 stock.[9] Additionally, it is clear that in 1959, when the company redeemed 451 shares of Mr. Fireoved's preferred stock, the general provisions of section 306—aside from the exceptions—would require that any amount realized by Mr. Fireoved be taxed at ordinary income rates rather than long term capital gain rates, because the company had earnings at that time of $48,235—more than the $47,355 required to redeem the stock at $105 per share.

Thus, the questions to be decided on this appeal are (1) whether certain of the exceptions to section 306 apply to permit the Fireoveds' reporting their gain as a long term capital gain, and (2) whether 65 of the 451 shares redeemed are not section 306 stock because of the first in-first out rule of Treasury Regulation § 1.1012–1(c).

*III. Was the distribution of the stock dividend "in pursuance of a plan having as one of its principal purposes avoidance of Federal income tax?"*

■ Mr. Fireoved asserts that the entire transaction should fall within the exception established by section 306(b)(4)(A), which provides: "If it is established to the satisfaction of the Secretary or his delegate * * * that

---

section 871(a) or section 881(a), as the case may be.

(g) Change in terms and conditions of stock.—If a substantial change is made in the terms and conditions of any stock, then, for purposes of this section—

(1) the fair market value of such stock shall be the fair market value at the time of the distribution or at the time of such change, whichever such value is higher;

(2) such stock's ratable share of the amount which would have been a dividend if money had been distributed in lieu of stock shall be determined as of the time of distribution or as of the time of such change, whichever such ratable share is higher; and

(3) subsection (c)(2) shall not apply unless the stock meets the requirements of such subsection both at the time of such distribution and at the time of such change.

(h) Stock received in distributions and reorganizations to which 1939 Code applied.—If stock—

(1) was received in a distribution or reorganization to which the Internal Revenue Code of 1939 (or the corresponding provisions of prior law) applied,

(2) such stock would have been section 306 stock if this Code applied to such distribution or reorganization, and

(3) such stock is disposed of or redeemed on or after June 22, 1954, then the foregoing subsections of this section shall not apply in respect of such disposition or redemption. The extent to which such disposition or redemption shall be treated as a dividend shall be determined as if the Internal Revenue Code of 1939 (as modified by the provisions of this Code other than the foregoing subsections of this section) continued to apply in respect of such disposition or redemption.

9. The company had accumulated earnings and profits of more than $50,000 in 1954, the dividend was not common on common, and the receipt of the dividend was not a taxable event when it occurred in 1954. It should also be noted that Mr. Fireoved does not dispute the applicability of section 306 to the dividend when it was issued.

the distribution, and the disposition or redemption * * * was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax," then the general rule of section 306(a) will not apply.

As a threshold point on this issue, the Government maintains that because Mr. Fireoved never attempted to obtain a ruling from the "Secretary or his delegate" the redemption should be covered by section 306(a), and the district court should not have reached the question whether the exception applied to Mr. Fireoved. Mr. Fireoved urges that the district court had the power to consider the matter *de novo*, even without a request by the taxpayer to the Secretary or his delegate. Because the ultimate result we reach would not be altered by whichever of these two courses we choose, we do not resolve this potentially complex procedural problem.[10]

The district court, based on the assumption that it had the power to decide the question, found that although one of the purposes involved in the issuance of the preferred stock dividend may have been business related, another principal purpose was the avoidance of Federal income tax.

Mr. Fireoved's analysis of the facts presented in the stipulations would reach the conclusion that the *sole* purpose of the stock dividend was business related. He relies heavily on that portion of the stipulation which describes why the decision was made to combine his business with the Edelmayer-Craver partnership: "The partnership could provide the additional manpower which the expected departure of Robert L. Fireoved from the Corporation would require. Additionally, the partnership needed additional working capital which the Corporation had and could provide." Based primarily on the latter sentence, Mr. Fireoved asserts that the district court had no choice but to find that the

transaction was business related and that it therefore had no avoidance incentive.

In making this argument, however, Mr. Fireoved overlooks the plain import of the language of section 306(b) (4). Whether the section requires the decision to be made by the Secretary or the district court, it is clear that "one of [the] principal purposes" of the stock dividend was not for "the avoidance of Federal income tax." The stipulation demonstrates no more than that the reorganized company required more capital than could be supplied by the partnership alone. The stipulation is completely in harmony with the following fact situation: After the partnership was combined with the corporation, the business required the $30,000 contributed by the partnership and all of the $60,000 Mr. Fireoved had in the corporation. Mr. Fireoved decided to take the stock dividend rather than to distribute the cash to himself as a dividend, and then to make a loan to the corporation of the necessary money because if he took the cash, he would subject himself to taxation at ordinary income rates. Therefore "one of the principal purposes" of the stock dividend would be for "the avoidance of Federal income tax."

In a situation such as the one presented in this case, where the facts necessary to determine the motives for the issuance of a stock dividend are peculiarly within the control of the taxpayer, it is reasonable to require the taxpayer to come forward with the facts that would relieve him of his liability. Here the stipulation was equivocal in determining the purpose of the dividend and is quite compatible with the thought that "one of the principal purposes" was motivated by "tax avoidance." We hold then that the district court did not err in refusing to apply the exception created by section 306(b) (4) (A).[11]

10. For the same reason, we do not decide this issue in Part II, *infra*.

11. It is important to note that apparently both Mr. Fireoved, in prosecuting this

action for a refund, and the Government, in its defense, assumed that if the distribution and redemption of the preferred stock were not controlled by § 306(a),

*IV. Did the prior sale by Mr. Fireoved of 24% of his underlying common stock immunize such portion of the section 306 stock he redeemed in 1959?*

The district court construed section 306(b) (4) (B) to mean that any time a taxpayer in Mr. Fireoved's position sells any portion of his underlying common stock and later sells or redeems his section 306 stock, an equivalent proportion of the section 306 stock redeemed will not be subject to the provisions of section 306(a). The Government has appealed from this portion of the district court's order and urges that we reverse it, based on the history and purpose of section 306 and the particular facts here.

The stipulations indicate that, "On February 28, 1958, Fireoved and Craver each sold 24 shares of common stock in the corporation to Edelmayer," and that appropriate stock certificates were issued. From this fact, Mr. Fireoved reasons that his sale of 24 of his 100 shares of common stock was undertaken solely for the business purpose of satisfying Mr. Edelmayer's desire for more control of the corporation, and therefore he should be given the benefit of section 306(b) (4) (B). In addition, Mr. Fireoved contends that the disposition of his section 306 stock was related to a business purpose because he used part of the proceeds to pay off a $20,000 loan that the company had made to him.

Mr. Fireoved has the same burden here of showing a lack of a tax avoidance purpose that he had in section III *supra*. It is clear from the limited facts set forth in the stipulations that he has not established that the disposition of 24% of the 535 shares of the section 306 preferred stock he owned "was not in pursuance of a plan having as one of its principal purposes the avoidance of federal income tax."[12] More important, however, is that an examination of the relevant legislative history indicates that Congress did not intend to give capital gains treatment to a portion of the preferred stock redeemed on the facts presented here.

It is apparent from the reaction evinced by Congress to the *Chamberlin* case, *supra*, that by enacting section 306 Congress was particularly concerned with the tax advantages available to persons who controlled corporations and who could, without sacrificing their control, convert ordinary income to long term capital gains by the device of the preferred stock bail-out. The illustration given in the Senate Report which accompanied section 306(b) (4) (B) is helpful in determining the sort of trans-

the gain would be subject to taxation as a long term capital gain. This is not necessarily the case at all. Whether or not § 306 governs the transaction, it nonetheless involves a redemption of stock by a corporation to which § 302 could apply. Under the tests set out in § 302(b)—the relevant one of which appears to be § 302(b) (1)—Mr. Fireoved, who had the burden of proof, may well have been unable to show that the redemption was not "essentially equivalent to a dividend." United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970). We hold, however, that it is now too late for the Government to raise this issue.

12. Consistent with Mr. Fireoved's sale of 24 shares of common stock in 1958 could have been his knowledge that one year later he would be selling his section 306 stock and a desire on his part to avoid taxation at ordinary income rates. As noted later in the opinion, the sale of just 24 shares was enough so that he retained effective control—in the form of veto power—over the corporation. Moreover, the fact that Mr. Fireoved needed $20,000 of the proceeds to pay off a loan to the corporation would not meet his burden. The proceeds of the redemption totaled $47,355. Thus, although $20,-000 of the redemption may not have been to avoid taxes, we can ascribe no purpose other than tax avoidance to the receipt of the additional $27,355. Therefore, since one of the principal purposes of the redemption of 451 shares of preferred stock was "the avoidance of Federal income tax," Mr. Fireoved may not take advantage of § 306(b) (4) (B) for any part of the redemption.

actions meant to be exempted by section 306(a):

> Thus if a shareholder received a distribution of 100 shares of section 306 stock on his holdings of 100 shares of voting common stock in a corporation and sells his voting common stock before he disposes of his section 306 stock, the subsequent disposition of his section 306 stock would not ordinarily be considered a tax avoidance disposition *since he has previously parted with the stock which allows him to participate in the ownership of the business.* However, variations of the above example may give rise to tax avoidance possibilities which are not within the exception of subparagraph (B). Thus if a corporation has only one class of common stock outstanding and it issues stock under circumstances that characterize it as section 306 stock, a subsequent issue of a different Class of common having greater voting rights than the original common will not permit a simultaneous disposition of the section 306 stock together with the original common to escape the rules of subsection (a) of section 306.

S.Rep.No.1622, 83d Cong., 2d Sess., 1954 U.S.C.C.A. News, pp. 4621, 4881 (emphasis added).

Thus, it is reasonable to assume that Congress realized the general lack of a tax avoidance purpose when a person sells *all* of his control in a corporation and then either simultaneously or subsequently disposes of his section 306 stock. However, when *only a portion* of the underlying common stock is sold, and the taxpayer retains essentially all the control he had previously, it would be unrealistic to conclude that Congress

meant to give that taxpayer the advantage of section 306(b) (4) (B) when he ultimately sells his section 306 stock.[13] Cf. United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970).

Shortly after Mr. Fireoved's corporation had been combined with the Edelmayer-Craver partnership, significant changes to the by-laws were made. The by-laws provided that corporate action could be taken only with the unanimous consent of all the directors. In addition, the by-laws provided that they could be amended either by a vote of 76% of the outstanding common shares or a unanimous vote of the directors. When the businesses were combined in late 1954, each of the directors held ⅓ of the voting stock, thereby necessitating a unanimous vote for amendment to the by-laws. After Messrs. Fireoved and Craver each sold 24 shares of common stock to Mr. Edelmayer, Mr. Fireoved held 25⅓% of the common (voting) stock, Mr. Craver 25⅓% and Mr. Edelmayer 49⅓%. It is crucial to note that the by-laws provided for a unanimous vote for corporate action, and after the common stock transfer, the by-laws were capable of amendment only by a unanimous vote because no two shareholders could vote more than 74⅔% of the common stock and 76% of the common stock was necessary for amendment. Thus, although Mr. Fireoved did sell a portion of his voting stock prior to his disposition of the section 306 stock, he retained as much control in the corporation following the sale of his common stock as he had prior to the sale. Under these circumstances it is not consonant with the history of the legislation to conclude that Congress intended such a sale of underlying common stock to exempt the proceeds of the disposition of section

13. Although this point was neither briefed nor argued, it might be contended, based on an analogous provision of the Code, § 1239, that § 306 should look strictly to a change in ownership rather than actual control of the corporation. When dealing with questions arising under § 1239, courts have considered only changes in the percentage of ownership without regard to whether control of the corporation has shifted. *See, e. g.* United States v. Parker, 376 F.2d 402 (5th Cir. 1967) ; Trotz v. Commissioner, 361 F.2d 927 (10th Cir. 1966). However, the legislative intent embodied in § 306 is so different from that of § 1239, that, based on the facts presented here, control is the relevant inquiry under § 306.

306 stock from treatment as ordinary income. Accordingly, the district court erred when it held that any of the preferred shares Mr. Fireoved redeemed were not subject to section 306(a) by virtue of section 306(b) (4) (B).[14]

*V. Does the rule of first in-first out mean that 65 of the 451 redeemed shares were those which Mr. Fireoved acquired when he incorporated his business in 1948 and thus should not be treated as section 306 stock?*

■ The district court held that 65 of 451 shares of preferred stock that Mr. Fireoved redeemed in 1959 represented the original shares issued to him in 1948 and were not, therefore, section 306 stock, and that the proceeds from their sales should be treated as a long term capital gain. The court reached this conclusion by applying Treas.Reg. § 1.1012–1(c). This regulation provides that when an individual acquires shares of the same class of stock in the same corporation on different dates and for different prices, sells a portion of those shares, and cannot adequately identify which lots were sold, for the purpose of determining the basis and the holding period, the first shares acquired are deemed to be the first shares sold.

Both the district court and Mr. Fireoved reason that the 65 preferred shares he received in 1948 were the first such shares owned by him. In 1954, when the corporation was recapitalized, Mr. Fireoved surrendered his certificate for 65 shares, received a 535 share stock dividend and was issued a certificate representing 600 shares of preferred stock. When he disposed of 451 shares in 1959, it was impossible to identify which shares of the 600 share certificate were being sold. By applying the convenient tool of section 1.1012–1(c), one might conclude that the 65 original

shares were sold first because they were received first.

Superficially, this analysis appears to be correct. However, it overlooks the existence of Section 1223(5) of the Code and the regulations issued pursuant thereto. This section governs the transaction in question because section 307 required Mr. Fireoved to allocate his investment in the underlying common stock between the stock and the preferred stock issued as a dividend. Section 1223(5) is then clear in that it will apply to all situations in which an allocation of basis has occurred pursuant to section 307. These provisions broadly state that the holding period for stock received as a stock dividend is equal to the period for which the underlying stock was held. Applying this test we discover that the preferred stock dividend of 535 shares was issued with respect to the original 100 shares of common received by Mr. Fireoved. Therefore, the holding period for the 535 shares dividend relates back to the date on which the underlying common was issued. Coincidentally, the original 65 shares of preferred stock were issued on the same date as the common. Because the constructive date of issuance for all of the 600 shares of preferred stock owned by Mr. Fireoved is identical, neither the 65 shares nor the 535 shares are first in, but rather are in at the same time.

Since it is impossible adequately to identify which shares were sold when Mr. Fireoved redeemed 451 shares of preferred stock, we hold that a pro rata portion of the 65 shares were redeemed in 1959. In other words, the percentage of the 600 shares of preferred which were not section 306 stock may be represented by the fraction 65/600. That percentage of the 451 shares redeemed in 1959, therefore, would not be section 306 stock.[15]

---

14. It is important to note that our decision relates only to the facts of this case. We express no view on the situation in which less than all the voting shares are sold but enough are disposed of to relinquish effective control prior to

or simultaneous with the sale of section 306 stock.

15. The number of shares may be determined as follows: 65/600 x 451 = 48.86 shares of non-section 306 stock.

### VI. Conclusion.

Because we affirm in part and reverse in part the judgment of the district court, the cause will be remanded for proceedings consistent with this opinion.

Again, the assumption in the district court was that whatever the number of original shares redeemed, the proceeds from those shares would be taxed as a long term capital gain. Such a result might not necessarily follow. Note 11, *supra;* United States v. Davis, *supra.*