**TECUMSEH CORRUGATED BOX COMPANY, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 90–1814.

United States Court of Appeals, Sixth Circuit.

Argued March 28, 1991.

Decided May 7, 1991.

Stephen M. Feldman, Michael P. Witzke, Sheldon A. Fealk (argued), Couzens, Lansky, Fealk, Ellis, Roeder & Lazar, Farmington Hills, Mich., for petitioner-appellant.

Abraham N.M. Shashy, Jr., Chief Counsel, Internal Revenue Service, Office of Chief Counsel, Washington, D.C., Gary R. Allen, Acting Chief, Richard Farber, Bruce R. Ellisen, Charles Bricken (argued), U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for respondent-appellee.

Before MERRITT, Chief Judge, GUY and NORRIS, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Petitioner, Tecumseh Corrugated Box Company (petitioner, taxpayer, or Tecumseh), appeals from a Tax Court decision finding in favor of respondent, Commissioner of Internal Revenue (respondent or Commissioner). The Tax Court held that petitioner could not use the installment method to account for capital gains resulting from the sale of its properties. 94 T.C. 360.

Petitioner argues that the Tax Court erred because the sale of one of its properties took place under the threat of condemnation. Thus, petitioner was still entitled to account for its capital gains on an installment basis. Additionally, petitioner argues that because the purpose of its transactions was to resolve its labor problems, rather than to avoid paying taxes, it should be excepted from the general rule precluding installment write offs. We find petitioner's arguments without merit and, accordingly, affirm.

I.

Tecumseh was a corporation with its principal place of business in Tecumseh, Michigan, at the time it filed its petition. Its stockholders and their corresponding percentages of ownership of Tecumseh during the years in issue were as follows: J.J. Robideau Living Trust (7.95%), G.E. Robideau Living Trust (.70%), J.A. Robideau Living Trust (13.49%), Margaret A. Robideau (13.49%), Jeffrey T. Robideau (13.49%), J.J. Robideau Irrevocable Trust Number One (39.09%), J.J. Robideau Irrevocable Trust # 2 (9.79%), and The Robideau Foundation (2%).

We adopt the Tax Court's statement of the facts as set forth below. From its inception in 1963, Tecumseh has been engaged in the manufacturing and selling of corrugated containers. Between 1972 and 1985, petitioner conducted paper milling and box manufacturing operations at its Jaite Mill plant located near Cleveland, Ohio. The paper mill manufactured card-

board from pulp and other raw materials. This cardboard was sold to petitioner's other divisions and other box fabricators. The box operation produced boxes for sale.

The paper mill, which was constructed in 1905, was the anchor of the Jaite Mill Historic District. This mill, which originally produced paper sacks from rags and rope, recycled cardboard boxes into high quality kraft paper. Tecumseh's other divisions molded the paper and used it for the middle layer of the corrugated cardboard boxes that it manufactured.

In 1979, the machinery and equipment comprising the Jaite Mill plant were entered in the National Register of Historic Places by the Heritage Conservation and Recreation Service, United States Department of the Interior. None of petitioner's box plant equipment had any historical significance.

On December 27, 1974, Congress enacted Public Law 93–555 (the Act), which formally established the Cuyahoga Valley National Recreation Area (Cuyahoga). 16 U.S.C. § 460ff. Tecumseh's Jaite Mill plant, including the box plant and certain other properties, was located within the boundaries of Cuyahoga.

Congress originally appropriated $34,500,000 for the acquisition of lands within Cuyahoga but ultimately increased the appropriation to $70,100,000. See 16 U.S.C. § 460ff–5(a). The funds appropriated by Congress were not earmarked to purchase any specific properties. Rather, the Secretary of the Interior established an acquisition plan that indicated the order in which property would be acquired with the appropriated funds. 16 U.S.C. § 460ff–2(a).

Petitioner was aware of the Act and, at various meetings of its board of directors, discussed the possibility that its property would be condemned. As early as May 1974, petitioner was aware of the possibility that the Jaite Mill and Cleveland box plants and surrounding property would be acquired by the National Park Service for Cuyahoga. In May 1974, petitioner retained Ernest Genovese (Genovese), a local attorney, to advise petitioner regarding the possible acquisition of its real estate by the National Park Service.

In 1975, petitioner was contacted by William Birdsell (Birdsell), Park Superintendent of Cuyahoga. Birdsell informed petitioner of the government's plan to acquire properties owned by petitioner in and around Cuyahoga, including the Jaite Mill and Cleveland box plants. Petitioner was also advised by the Army Corps of Engineers that the plan projected acquisition of the Jaite Mill and Cleveland box plants for 1980, the last year of acquisition.

The National Park Service established a priority list with respect to the order in which properties would be acquired. Petitioner knew that its properties were assigned a low priority in connection with the acquisition plan. Petitioner was also aware that acquisition of its properties was dependent upon congressional appropriations and that delays due to lack of funding could occur.

Petitioner was anxious to sell its Jaite Mill and Cleveland box plants. As early as 1975, petitioner looked for prospective purchasers for the Jaite Mill plant, but those contacted were not interested.

Beginning in 1975, Genovese attempted to get the National Park Service to acquire petitioner's properties earlier than scheduled. In July 1976, Genovese contacted United States Congressman John F. Seiberling for assistance. Congressman Seiberling reviewed the reasons given by the National Park Service for delayed acquisition of petitioner's properties and concurred with its position.

By letter dated December 15, 1977, Genovese attempted to persuade the National Park Service to provide for an early acquisition of Tecumseh's properties due to the economic hardship of retaining the properties. Title 16 U.S.C. § 460ff–1(g) provides:

In exercising his authority to acquire property [for the Cuyahoga Valley National Recreation Area], the Secretary shall give prompt and careful consideration to any offer made by an individual owning property within the recreation area to sell such property, if such individual notifies the Secretary that the contin-

ued ownership of such property is causing, or would result in, undue hardship.

In January 1978, appraisers and land acquisition officers for the National Park Service made a preliminary inspection of petitioner's property prior to requesting bids for an appraisal. The appraisal was never ordered.

In March 1978, Tecumseh purchased land in Twinsburg, Ohio, with the intent of constructing a new building to replace the Cleveland box plant that was to be acquired by the National Park Service. During March, April, and May 1978, Genovese, on behalf of petitioner, vigorously attempted to get the National Park Service to acquire its properties as soon as possible.

In early 1978, Tecumseh retained counsel for a review and determination of the potential tax effects of the sale of its properties to the federal government. Specifically, petitioner requested advice on whether it could defer realizing income for federal income tax purposes from the receipt of the proceeds from the sale of its properties. Petitioner's tax counsel suggested that petitioner obtain a private letter ruling for a determination of the possibility of electing to defer the realization of gain pursuant to section 1033, which allows deferral when properties are condemned. Petitioner did not pursue counsel's advice.

By letter dated June 26, 1978, Park Superintendent Birdsell advised Genovese that, "[a]s discussed with you previously, our plans have not changed; when acquisition of this property will occur has not been finalized. However, it is unlikely that acquisition will take place before late in fiscal year 1980 (fiscal year 1980 begins October 1, 1979)."

In early 1979, the National Park Service developed a proposal to divide petitioner's properties into five parcels. According to the terms of this proposal, the National Park Service would purchase the four small, unimproved parcels but not the more expensive parcel containing the Jaite Mill and Cleveland box plants. Petitioner objected to the acquisition of anything other than the entire property and declined the National Park Service's proposal in 1979 and again in 1981. By July 1979, petitioner was aware that its properties were not scheduled to be purchased in 1980. By April 1980, petitioner was aware that the government had halted all purchases of property for Cuyahoga because it lacked funds.

In a letter to Genovese dated November 7, 1979, James J. Robideau (Robideau), Tecumseh's president, explained that petitioner was having serious labor problems due to the uncertainty of acquisition by the National Park Service. These labor problems included high employee turnover, defective products, serious absenteeism, and unfavorable contract terms. Robideau also noted that regular, long-standing customers were beginning to turn elsewhere.

In December 1980, the Ohio Environmental Protection Agency (Ohio EPA) cited petitioner for violations with respect to the oil-fired boiler system and waste water treatment facilities at the Jaite Mill plant. Petitioner installed new gas-fired boilers in response to the Ohio EPA's actions. To settle the matter with the Ohio EPA, petitioner signed a consent decree and paid a $4,500 fine.

By September 1981, the uncertainty of the acquisition was impeding petitioner's ability to negotiate contracts of any duration with regular and potential customers. Due to these circumstances, petitioner intended to claim hardship again in an attempt to expedite the acquisition of its property by the National Park Service. In a letter dated November 4, 1981, the National Park Service confirmed its agreement to an acquisition strategy for petitioner's properties. Pursuant to this strategy, the government intended to subdivide petitioner's property into five parcels and to purchase the four unimproved parcels "on a one-per-year" basis "as soon as funds are available and the required surveys and appraisals are completed." Acquisition of the fifth parcel, which included the mill and associated structures, would be "postponed until appropriations for that purpose are available." The property was to be divided in order to facilitate government acquisition of the smaller, less expensive parcels.

By letter dated July 20, 1982, petitioner was advised that the National Park Service was ordering appraisals of the four small, unimproved parcels. These appraisals were in fact ordered. Because of continued economic problems during 1982, petitioner weighed the possibility of continuing the operations at the Jaite Mill facilities versus the cost of shutting down the paper mill and box plant.

In early 1983, petitioner began negotiating with the National Park Service with respect to the piecemeal acquisition strategy. By March 16, 1983, petitioner and the National Park Service had agreed that the four small parcels would be purchased in 1983. On the same date, petitioner and the National Park Service reached an agreement in principle that the remaining parcel containing the paper mill and box plant would be purchased in 1984, if funds were available.

In May 1983, Tecumseh began soliciting preliminary figures for construction of a replacement facility for the box plant on property it already owned in Twinsburg, Ohio. Also in May 1983, Tecumseh ordered an appraisal of the four small parcels by S.M. Dix & Associates, Inc. (Dix). In July 1983, National Park Service personnel toured the paper mill and box plant in preparation for the acquisition.

Prior to September 1, 1983, the National Park Service offered to purchase the four small parcels for a total price of $219,500. Despite Genovese's recommendation to accept this offer, petitioner rejected the offer and made no counter offer. Petitioner, however, took action intended to force immediate condemnation of its properties. It executed a topsoil removal agreement with a commercial topsoil marketing company. Removal of topsoil would have required clear-cutting trees and other vegetation, causing extensive damage to the land. The Act prohibits removal of topsoil and cutting of timber to the detriment of the land. *See* 16 U.S.C. § 460ff–1(c); 16 U.S.C. § 460ff–3.

On September 15, 1983, the National Park Service petitioned Congress to authorize a declaration of taking of the four small, unimproved parcels to prevent removal of the topsoil and timber. Congress, however, denied the National Park Service the authority to file the requested declaration of taking.

Prior to September 17, 1983, petitioner was visited by an Ohio EPA inspector and received another citation regarding the paper mill operation. On September 17, 1983, Genovese met with Congressman Seiberling and representatives of the National Park Service. The results of this meeting were reported to petitioner's board of directors on September 2, 1983, and recorded in the corporate minutes as follows:

(a.) The Chairman and the Appropriation committee will introduce a special bill for the purchase of the property, stressing the fact that they needed to buy the land first.

(b.) That the agreement will be in writing and the Park Authority would do the following:

(1) Will provide [petitioner] with a time table (approximately 6 months)

(2) Put in motion a request to receive appraisals (30 days)

(3) An additional 30 days to pick the appraisal

(4) 120 days to get all the numbers together

(5) 30 days to make recommendation to Congress

(6) They would write the [Ohio] EPA and inform them that they are going to buy the land within sixty (60) days, providing [petitioner] agreed to sell the land right now.

On September 22, 1983, Tecumseh agreed to sell to the United States Department of the Interior the four small, unimproved parcels of land for a total price of $235,375. On the advice of Genovese, petitioner considered the sale an involuntary conversion. As of November 22, 1983, petitioner considered that the four small, unimproved parcels had been sold to the government, although payment had not yet been received. As of that date, petitioner also anticipated that its remaining property would be sold by June 1984.

Petitioner's labor problems were caused by employee uncertainty over the purchase of the plant by the National Park Service. Due to these continuing labor problems, petitioner consulted with Donald Lansky (Lansky), labor counsel, on potential methods to circumvent or eliminate the labor union and its collective bargaining agreement. In a memorandum from Lansky dated January 19, 1984, petitioner received advice concerning the basic principles of successorship and alter ego employers to be considered in evaluating the risks and methods of structuring the sale of a family business. The memorandum noted:

Normally, where assets are purchased, the issue is whether the buyer is a "successor employer" who is obligated to bargain with the seller's union(s).... The determination of the successorship issue is based on whether the identity of the employing enterprise remains intact. The result of being a successor is that the buyer is then required to recognize and bargain with the union that had represented the predecessor's employees....

....

... The NLRB will find alter ego status "where the two enterprises 'have substantially identical' management, business purpose, operation, equipment, customers and supervision, as well as ownership...."

The threshold question to be determined in alter ego cases is whether there is common ownership or control. In this respect, the existence of a family relationship between the new and old owners has been considered by the NLRB as an important factor in finding common ownership and in denying the existence of an arm's length transaction on the sale....

... To avoid the risks of being considered an alter ego, it is, therefore, imperative to maximize the differences between the new and old entities. In this respect, it may be helpful to have a complete cessation of operations of the existing company before the new entity is established to take over. Even here, however, where this is a mask for avoiding labor law obligations, the NLRB will not treat the transaction as being at "arm's length."

Despite this advice, petitioner did not restructure its operations with new lines of production, injection of capital and equipment, and changes in management or supervision. Petitioner was subsequently advised by different labor counsel that it could not avoid or eliminate the collective bargaining unit by structuring a sale of its property to another related entity.

By letter dated February 8, 1984, the National Park Service advised petitioner that it had advertised for the services of an appraiser to appraise petitioner's remaining property. The advertisement projected awarding the contract for appraisal by April 1, 1984, with a 120–day delivery schedule. At that time, the parties understood that a written appraisal would be delivered in August 1984.

Petitioner transferred the four small, unimproved parcels of land to the United States by warranty deed dated February 17, 1984, for $235,375.

After the February 1984 sale, petitioner still owned Tract No. 107–117, which contained the Jaite Mill plant, consisting of 59.59 acres of land. Prior to September 1983, all of the tracts were included in one large parcel of land owned by petitioner. The five tracts were interdependent, and the government intended to acquire all of them.

By letter dated March 16, 1984, the Ohio EPA gave petitioner an extension allowing it to operate the Jaite Mill plant until September 15, 1984, without curing its waste water violations. Subsequently, the Ohio EPA agreed to allow petitioner to operate the paper mill until November 15, 1984. Petitioner agreed to close permanently its paper mill operations at that time unless all its pollution problems were corrected. The Ohio EPA's extension was based on its understanding that the National Park Service would deliver an appraisal of petitioner's property by September 1, 1984, and would complete the purchase of petitioner's property no later than January 1, 1985.

Petitioner retained Dix to provide an appraisal of its remaining property for sale to the government. On May 22, 1984, appraisers from Dix conducted an inspection of petitioner's real and personal property within Cuyahoga. On July 13, 1984, the appraiser retained by the United States, Keystone Appraisal Company (Keystone), also inspected petitioner's Cuyahoga property. The appraisers from Keystone were accompanied by representatives of petitioner during their inspection of petitioner's property.

On May 31, 1984, petitioner entered into a land contract (the first disposition) to sell its remaining properties within Cuyahoga, including buildings, machinery, equipment, and trade fixtures, to the James J. Robideau Irrevocable Trust Number One and the James J. Robideau Irrevocable Trust Number Two (the Trusts). The Trusts were also shareholders in Tecumseh. As of May 31, 1984, petitioner did not have a written appraisal of its property. Under the terms of the contract, petitioner as seller and the Trusts as purchaser agreed:

(k) That the full consideration for the sale of the land to the Purchaser shall be the price at which the property is finally acquired by the United States Department of the Interior, National Park Services, Cuyahoga Valley National Recreation Area, of which the sum of Ten Thousand Dollars ($10,000) will be paid to the Seller at the time that such price is so determined. The balance of such purchase price shall be paid to the Seller with interest thereon from the date hereof at the rate of nine percent (9%) per annum while Purchaser is not in default, and at the rate of nine percent (9%) per annum during the period of any default in payment. Such additional purchase price shall be paid over a period of fifteen (15) years, in equal annual installments including interest at the aforesaid rate of nine percent (9%) per annum, commencing on the anniversary date hereof and annually thereafter until paid in full; such payments to be applied first upon interest and then the balance on principal. Provided, however, the Purchaser shall have the right to prepay all or any part of the unpaid principal balance with accrued interest at any time without penalty.

. . . .

(n) In the event that there arises any Federal and/or State income tax liability to the Seller due to any subsequent disposition of the subject property by the Purchaser, Purchaser agree [sic] to make, in addition to any other required payments, a payment to Seller sufficient to cover said tax liability, and any interest and penalty thereon. Payment shall be made by Purchaser within the time limit specified by the appropriate taxing authority for payment of any such tax liability of the Seller.

(o) In addition to the land described in Paragraph 1, the herein contemplated sale shall include all machinery, equipment and trade fixtures located in, on, attached or appurtenant to the said land, buildings and improvements thereto, and all of the oil, gas and other minerals, and the constituents thereof, owned by the Seller in and under the said land, or wheresoever located. . . .

Contemporaneously with execution of the land contract on May 31, 1984, the Trusts executed an assignment of the land contract to the JMJ Development Company (the partnership) for "the full consideration of One Dollar ($1.00) and no other consideration." The partnership, as assignee, agreed to assume and to pay the indebtedness under the land contract. Also on May 31, 1984, the partnership filed for recording a memorandum of land contract with the Summit County, Ohio, Registrar of Deeds.

The partnership was formed on June 5, 1980, retroactively effective as of November 30, 1979, by the J.J. Robideau Irrevocable Trust Number One and the James J. Robideau Irrevocable Trust Number Two. The James J. Robideau Irrevocable Trust Number One owned an 80–percent interest in the capital of the partnership, and the James J. Robideau Irrevocable Trust Number Two owned a 20–percent interest in the capital of the partnership.

By lease dated June 28, 1982, the partnership held oil and gas rights under the Jaite Mill and Cleveland box plants and surrounding property. The partnership agreement provides that distributions to the partners of net operating profits of the partnership shall be made at such times as the partners shall reasonably agree.

Pursuant to a lease dated May 31, 1984, the partnership leased the property, machinery, and equipment back to petitioner. On its U.S. Partnership Return of Income, the partnership reported gross rental income of $121,855 and $614,463 for 1984 and 1985, respectively.

By letter dated September 20, 1984, Genovese again attempted to persuade Congressman Seiberling that petitioner was suffering a severe hardship due to the delay by the National Park Service in acquiring the property. Genovese referred to petitioner as the owner of the property; the partnership was not mentioned.

Genovese represented both petitioner and the partnership in connection with the sale of the property. By letter dated November 13, 1984, Genovese, on behalf of petitioner, advised the National Park Service that "my client, Tecumseh Corrugated Box Company, is prepared to sell all of its assets ... for the sum of $4,500,000.00, payable $2,000,000.00 this year, and the balance of $2,500,000.00 when the funds are available for said acquisition." Sale of the property to the National Park Service was approved by Robideau, as petitioner's president, and by petitioner's board of directors.

By letter dated November 27, 1984, J.W. Blanton, Jr. (Blanton), Land Resource Officer, Cuyahoga Valley Land Acquisition Office, National Park Service, notified Genovese that petitioner's offer was acceptable subject to an approved appraisal of not less than $4,500,000. Blanton also enclosed a corporate offer to sell real property requiring the signatures of all principals, including corporate officers of petitioner and the partnership. The National Park Service also required a corporate resolution by petitioner authorizing its officers to sell the property to the United States.

As of December 1984, petitioner considered the remaining parcel of improved real estate as sold to the federal government. (The parties consistently refer to the sale as "the December 1984 sale," although title did not pass until January 1985.) By corporate warranty deed dated January 16, 1985, petitioner and the partnership, as grantors, transferred title to the property to the United States (the second disposition) for the total sum of $4,500,000, with $2,000,000 payable at closing and $2,500,000 payable on or before December 1, 1985.

After the property was acquired by the United States, the paper mill operation was discontinued and only the box plant was continued in operation. By December 1984, petitioner was operating its box plant in new quarters. Approximately $1,460,000 was expended to construct a building to replace the operations performed at the box manufacturing business. The employees of the box plant continued the same union representation.

At the time of the first disposition of the property on May 31, 1984, to the Trusts, petitioner, for accounting purposes, entered the sale of the property as a land contract receivable of $2,000,000 from the partnership. Subsequently, an adjusting journal entry was recorded on petitioner's books and records for the fiscal year ending October 31, 1984, to reflect an additional land contract receivable from the partnership.

In the notes to its financial statements for the fiscal year ending October 31, 1984, petitioner disclosed the land contract and lease as follows:

NOTE 6: RELATED PARTY TRANSACTIONS

The Company is leasing or renting trailers, automobiles, computer equipment, and a maintenance facility from a corporation owned and operated by the immediate family of the President and major stockholder of the Company. The current monthly charge under these arrangements is $19,279. The total payments to this related party during the year amounted to $218,795. These leas-

ing arrangements are classified as operating leases.

The Company has two land contracts receivable from a partnership whose partners are irrevocable trusts created for the benefit of the children of the President of the Company. The land contracts receivable are payable over the next six to fifteen years with interest at six to eleven percent per annum.

. . . .

## NOTE 9: EXTRAORDINARY ITEM

The Company sold its Jaite facility and equipment on May 31, 1984 to a partnership whose partners are irrevocable trusts as discussed in note 6. The total selling price of $4,050,000 [sic] is contingent upon the subsequent sale of the property by the partnership to the United States Department of the Interior. The amount has been reported as an extraordinary item since it is of an unusual nature and is not expected to occur again. The amount has been reported at the net of the applicable income taxes of $1,433,604.

The partnership received payments from the United States in the amounts of $2,000,000 and $2,500,000 on January 18, 1985, and May 3, 1985, respectively. On its 1985 federal income tax return, the partnership reported a sale of the property on January 16, 1985, and reported a gain of $251,667. The gain reported by the partnership was equal to the depreciation on the property, machinery, and equipment claimed from May 31, 1984, through January 16, 1985.

On its 1985 income tax return, petitioner reported principal payments of $136,884 received from the partnership. Also on its 1985 income tax return, petitioner reported a net long-term capital loss of $14,950. Petitioner elected to carryback the net capital loss to its fiscal year ending October 31, 1985, and claimed a $4,186 decrease in tax.

## NOTE 9: EXTRAORDINARY ITEM— DISCONTINUED OPERATIONS

In December of 1984 the Jaite Mill was sold to the National Park Service and at that time all paper mill operations ceased. The Jaite Mill Division had been a part of the corporation for seventeen years. The loss of $46,246 reflects the operations loss for approximately one and one half months of this current fiscal year plus expenses connected with closing the operation.

Subject to the availability of funds, the National Park Service is supposed to acquire every piece of land designated for Cuyahoga. As of the trial date in June 1989, however, there were numerous parcels of land within Cuyahoga that still had not been acquired by the National Park Service.

As a result of petitioner's transactions, the Commissioner determined that the taxpayer was required to recognize all of its gain from the sale in 1985, the year in which the government paid the entire sales price to the trusts/partnership, even though the taxpayer had elected to recognize its gain in installments. The petitioner argued that its transactions fell within an exception to the Internal Revenue Code. The Tax Court ruled in favor of the Commissioner.

Petitioner appealed.

### II.

Generally, the entire amount of gain from the sale of a property is taxed within the year of sale. 26 U.S.C. § 451. Title 26 U.S.C. § 453 provides, however, that certain sales may be accounted for in installments. 26 U.S.C. § 453(a).[1] Such sales, called "installment sales," occur "where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs." 26 U.S.C. § 453(b)(1). In an installment sale, "the income recognized for any taxable year from a disposition is that proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price." 26

---

1. Specifically, 26 U.S.C. § 453(a) provides that "income from an installment sale shall be taken into account . . . under the installment method."

U.S.C. § 453(c). "Thus, the installment method alleviates possible liquidity problems which might arise from bunching of gain in the year of sale when a portion of the selling price has not been actually received." S.Rep. No. 1000, 96th Cong., 2d Sess. 7 (1980) U.S.Code Cong. & Admin. News 1980, pp. 4696, 4701.

Section 453 is not without exceptions, however. In particular, section 453(e)(1) provides:

> **(e) Second dispositions by related persons.—**
>
>   **(1) In general.—If—**
>
>     (A) any person disposes of property to a related person (hereinafter in this subsection referred to as the "first disposition"), and
>
>     (B) before the person making the first disposition receives all payments with respect to such disposition, the related person disposes of the property (hereinafter in this subsection referred to as the "second disposition"),
>
> then, for purposes of this section, the amount realized with respect to such second disposition shall be treated as received at the time of the second disposition by the person making the first disposition.

26 U.S.C. § 453(e)(1).[2] As the Senate Finance Committee explained in a report discussing the 1980 amendments to the provision, "the amount realized upon certain resales by the related party installment purchaser will trigger recognition of gain by the initial seller, based on his gross profit ratio, only to the extent the amount realized from the second disposition exceeds actual payments made under the installment sale." S.Rep. No. 1000, 96th Cong., 2d Sess. 14–15 (1980) U.S.Code Cong. & Admin.News 1980, pp. 4696, 4709. The change in legislation was prompted by "intra-family transfers of appreciated property [leading] to unwarranted tax avoidance

by allowing the realization of appreciation within a related group without the current payment of income tax." *Id.* at 14. U.S. Code Cong. & Admin.News 1980, pp. 4696, 4709.

Section 453(e)(1), an exception to section 453(a), also has exceptions. Section 453(e)(6)(B) provides that involuntary conversions are not treated as second dispositions for the purposes of section 453(e)(1) and, thus, the first party disposing of the property can still account for capital gains on an installment basis. The specific language of 26 U.S.C. § 453(e)(6)(B) is as follows: "A compulsory or involuntary conversion (within the meaning of section 1033) and any transfer thereafter shall not be treated as a second disposition if the first disposition occurred before the threat or imminence of the conversion." Section 1033 addresses the ways in which property can be involuntarily converted: "If property (as a result of its destruction in whole or in part, [through] theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted ... [,]" then various Internal Revenue Code provisions are triggered. 26 U.S.C. § 1033.

Petitioner acknowledges that the James J. Robideau Irrevocable Trust Number One, the James J. Robideau Irrevocable Trust Number Two, and JMJ Development Company are "related persons" within the meaning of sections 453(e)(1) and 453(f)(1). Thus, barring the application of some exception, petitioner would not be permitted to treat the sale of the Jaite Mill property under the installment method.

Petitioner argues, however, that one of the exceptions to 453(e)(1) applies, namely, section 453(e)(6). Petitioner argues that the sale of the property by the JMJ partnership in December of 1984 occurred under threat or imminence of condemnation by the federal government as part of the

---

**2.** Title 28 U.S.C. § 453(f)(1) defines the term "related person" as follows:

> **(1) Related person.**—Except for purposes of subsection (g) and (h), the term "related person" means—
>
>   (A) a person whose stock would be attributed under section 318(a) (other than para-

graph (4) thereof) to the person first disposing of the property, or

>   (B) a person who bears a relationship described in section 267(b) to the person first disposing of the property.

federal government's plan to acquire land for the Cuyahoga Valley National Recreation Area. We disagree and find, as respondent argues, that the sale was voluntary.

■ From the outset, we note that any factors indicating the government's intent to condemn which occurred *before* the first sale are discounted entirely for the purposes of section 453(e)(6)(B). The statute expressly provides that, before an exception for condemnation applies, "the first disposition [must have] occurred *before* the threat or imminence of the conversion." 26 U.S.C. § 453(e)(6)(B) (emphasis added). The first sale took place in May of 1984 and the second sale took place in December of 1984, although the Tax Court points out that the second sale was not recorded until January of 1985.

The Act providing for the creation of the Cuyahoga Valley National Recreation Area specifically enumerates the ways in which the Secretary of the Interior can acquire lands. The Secretary "may acquire lands, improvements, waters, or interest therein by donation, purchase with donated or appropriated funds, exchange, or transfer." 16 U.S.C. § 460ff-1(b). Condemnation is not listed as an option.

Even if we were to accept, *arguendo*, that the Secretary, via Congress, was empowered to condemn petitioner's property, the Secretary's only attempt at condemnation failed. When the petitioner sought to expedite the federal government's acquisition of his property, he negotiated an agreement to remove the topsoil from his property, an action clearly incompatible with any ultimate use of the property as a recreation area. The Secretary then petitioned Congress to authorize a taking of petitioner's land, but Congress denied the Secretary authority to do so. Because the Act did not explicitly provide the Secretary of the Interior with the power to condemn and because the Secretary's only attempt to condemn petitioner's property failed, we find that the Secretary, on his own, could not condemn petitioner's property. Thus, petitioner's argument, that the second disposition of his property, *i.e.*, the purchase by the federal government from the JMJ partnership was made under a threat of condemnation, is fundamentally flawed.

■ Even though the Secretary of the Interior could not have condemned petitioner's property under these circumstances, we will, nonetheless, address petitioner's arguments that condemnation of his property was threatened or imminent. The Tax Court has been liberal in defining the phrase "threat of condemnation" as employed in 26 U.S.C. § 1033. *Rainier Co. v. Commissioner*, 61 T.C. 68, 76 (1973), *rev'd on other grounds*, 538 F.2d 338 (9th Cir. 1975). A threat of condemnation exists "if the taxpayer might reasonably believe from representations of government agents and from surrounding circumstances that condemnation was likely to take place if he did not sell his property." *Id.*

Petitioner does not argue, at least directly, that government agents told him that his property would be condemned if he did not sell it. Petitioner does, however, make an oblique reference to testimony at trial by a government's witness, Blanton, implying that the government had somehow indicated that it would condemn petitioner's land if it was necessary. Petitioner contends that Blanton "testified that taking and condemnation were available to the Government as methods of acquiring Petitioner's land and that he had discussed this possibility with [petitioner's attorney]." Review of Blanton's testimony reveals that he discussed the taking of petitioner's land in response to petitioner's attempt to execute a topsoil agreement and not in regard to the petitioner's land as a whole. More importantly, the Secretary's attempt to take the land, as referred to by Blanton and discussed earlier, took place in 1983. Because the first disposition of petitioner's land took place in 1984, any impression petitioner may have had regarding a potential threat of condemnation by the government was created *before* the first transaction. Thus, Blanton's threat, if indeed it can be called a threat, militates against applying the "threat of condemnation" exception to the current case.

Moreover, plaintiff points to no other direct evidence that any government representative ever suggested that petitioner's land would ultimately be condemned by the government. This is particularly significant because, in *Rainier*, one of the factors that militated against finding the existence of a threat of condemnation was the fact that "no one actually stated that the land would be condemned if petitioner did not cooperate." *Id.* at 76.

Furthermore, explicit and direct statements regarding condemnation supported the decisions in the only two cases finding the existence of a threat of condemnation. The most straightforward case is *Maixner v. Commissioner*, 33 T.C. 191 (1959). In *Maixner*, the petitioners refused to execute an agreement with an agent for Minnesota's Department of Highways, which would have permitted the removal of gravel from their property. The agent "advised the [petitioners] that if they would not agree to the terms of his offer he would have the gravel deposits condemned." *Id.* at 193. The court held that "it was reasonable for petitioners to infer that [the agent] spoke with sufficient authority to make it likely that his threats could and would be carried out if petitioners did not execute the agreements he presented." *Id.* at 195.

In *S. & B. Realty Co. v. Commissioner*, 54 T.C. 863 (1970), the other case finding condemnation, the taxpayer had been told by authorities on two occasions that one of the actions available to the urban renewal agency was to condemn petitioner's property. Although the renewal agency provided the taxpayer with three options, which would have avoided condemnation, the court held that "[t]here was certainly 'an indication of something impending' which was undesirable.... In our opinion, had it not been for this sword of Damocles petitioner would not have sold his property." *Id.* at 870. The court continued: "The crucial factor is that the petitioner was compelled by this impending consequence to take evasive action." *Id.* The court then addressed the purposes of the statutory provision:

> When Congress enacted [the predecessors of 1033,] it obviously intended to

grant a measure of tax relief to those who were, compelled by the specified circumstances, to convert their property into cash. This intended relief should not be abrogated merely because the omnipotent, condemning authority affords the taxpayer the opportunity to retain his property by making an additional investment. Such an opportunity neither assuages the compulsion nor contravenes the intent of Congress.

*Id.* at 871. Additionally, petitioner points to the following circumstantial factors, arguing that they indicate the threat or imminence of a threat of condemnation:

1) Petitioner was aware of the government's power to condemn and that his property was within the boundaries of the recreation area.

2) Although the government had not previously had the funding to acquire petitioner's land, as of December of 1984, Congress had appropriated the required funds.

3) The government appraised and made an offer for the property.

4) Petitioner relied on the advice of its condemnation attorney that the government would be condemning petitioner's property.

We will address the factors set forth by petitioner in turn.

First, the fact that petitioner was aware that the government had condemnation authority and that petitioner's land fell within the boundaries of the proposed recreation area is irrelevant. Petitioner was aware of this *before* it sold its property to the JMJ partnership and, thus, the section 453(e)(6)(B) exception cannot apply.

Second, the availability of funds to purchase petitioner's property does not create a legitimate expectation of condemnation. While the unavailability of adequate funding can be used to find the non-existence of a threat of condemnation, the converse is not true. Under petitioner's reasoning, *any* availability of funding could create a threat of condemnation. Rather, the availability of funding is merely a prerequisite to a purchase and does not even suggest

that condemnation is the method through which the government will ultimately acquire the property. In *Rainier,* although the City of Seattle did not initially have the funds to purchase the petitioner's baseball stadium, the city ultimately acquired the money to purchase the property. Indeed, the City of Seattle would have been entirely unable to purchase the stadium without sufficient funds.

Petitioner's third argument, that the government's appraisal and offer to purchase petitioner's land constituted an imminent threat of condemnation, is equally without basis. Again, the circumstances petitioner relies on for support are simply the usual prerequisites to the purchase of any property. In *Rainier,* the City of Seattle also appraised the land it subsequently purchased, but the *Rainier* court did not hold that appraisals somehow signified that the City of Seattle was making preparations to condemn the petitioner's land. Rather, the appraisals provided benchmarks for the appropriate market price of the property. *Rainier,* 61 T.C. at 73.

In light of petitioner's unsuccessful attempts to accelerate the acquisition process and petitioner's other arguments offered to support a finding of condemnation, the *Rainier* court's holding is particularly on point. In *Rainier,* the Tax Court ultimately held that "[a] realistic view of the negotiations between petitioner and the City appears to be that the City was merely enlisting the cooperation of petitioner with the knowledge that such cooperation probably would be forthcoming. Petitioner had been trying to interest the City and County in its stadium for over a year...." *Id.* at 76. Additionally, in the current case, the petitioner had tried unsuccessfully to sell his property as early as 1975.

Finally, petitioner's argument that it relied on its attorney's advice that condemnation was imminent is equally without merit. When asked if he thought that the government was going to condemn his property, Tecumseh's president responded with the following: "No, I can't say that I—I did, not during my lifetime." Thus, it appears that petitioner's president did not rely on his attorney's legal advice.

### III.

Petitioner also argues that because the principal purpose of the first disposition of its property was to circumvent the collective bargaining agreement at its Jaite Mill plant and not to avoid paying taxes, it should be permitted to account for its capital gains using the installment method. The respondent does not agree that labor problems prompted the first disposition of petitioner's property. Further, the respondent argues that, even accepting petitioner's argument as to the purpose of the first disposition, because tax avoidance was at least *one* of petitioner's reasons for the first disposition, petitioner should not have been able to use the installment method. We agree with respondent. Tax avoidance does not have to be the exclusive reason for petitioner's action to fall within the provision disallowing the use of the installment method. We find that tax avoidance was at least one of the motivations for petitioner's disposition of his property.

Title 26 U.S.C. § 453(e)(7) provides the following:

> This subsection [453(e)] shall not apply to a second disposition (and any transfer thereafter) if it is established to the satisfaction of the Secretary [of Internal Revenue] that neither the first disposition nor the second disposition had as one of its principal purposes the avoidance of Federal income tax.

We note that neither the parties nor the Tax Court has relied on any cases interpreting this provision, and we are also unable to find any cases directly on this issue. Thus, we will review the legislative history concerning this provision as well as cases interpreting similar provisions of the Internal Revenue Code.

The Senate Finance Committee Report on this provision summarized it as follows: "[T]he resale rules will not apply in any case where it is established to the satisfaction of the Internal Revenue Service that none of the dispositions had as one of its principal purposes the avoidance of Federal

income taxes." S.Rep. No. 1000, 96th Cong., 2d Sess. 16 (1980) U.S.Code Cong. & Admin.News 1980, pp. 4696, 4710. The Senate Report acknowledged that 453(e)(7) "put[s] [the] taxpayer at a disadvantage if he or she should seek a court ruling on the merits of the issue." *Id.* at 17. Thus, the Committee "accept[ed] the ... legislation only with the specific understanding that ... [t]he Commissioner shall treat taxpayers fairly and equitably in light of all the facts and circumstances of each particular case in a manner consistent with the remedial intent of the preceding sections...." *Id.* at 17–18. Even exercising the caution the Senate advised in interpreting this provision, petitioner's argument fails.

The Senate Report advised that the nontax exception should be limited to "exceptional cases" and "would not apply if the resale terms would permit significant deferral of recognition of gain from the initial sale when proceeds from the resale are being collected sooner." *Id.* at 16. The circumstances of petitioner's transaction do not present an exceptional case. Indeed, petitioner's transaction falls precisely within the category of transactions specifically exempted from the non-tax avoidance provision. Because the federal government paid the JMJ partnership for the property in full in 1985, although in two installments, JMJ was able to collect the proceeds from the resale in full, while petitioner was still accounting for the sale using the installment method. This arrangement resulted in the deferral of the realization of capital gains by petitioner, and, thus, its purpose was for tax avoidance.

Further, the Senate Report provides illustrative examples of appropriate uses for the exception: "[I]t is anticipated that the regulations and rulings under the nontax avoidance exception will deal with certain tax-free transfers which normally would not be treated as a second dispos[it]ion of the property, e.g., charitable transfers, like-kind exchanges, gift transfers, and transfers to a controlled corporation or a partnership." *Id.* Petitioner's disposition of his property does not bear resemblance to any examples of non-tax avoidance set forth by the Senate Finance Committee.

Moreover, in addition to the legislative history of section 453(e)(7), case law analyzing analogous provisions does not support petitioner's argument. Title 26 U.S.C. § 306(b)(4) concerns the disposition of stock and provides that gains shall not be realized if the transaction "was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax." In *Pescosolido v. Commissioner,* 883 F.2d 187 (1st Cir.1989), the First Circuit held that a taxpayer's charitable donations of stock did not negate tax avoidance as a principal purpose for the transaction and, thus, the transaction did not fall within the ambit of section 306(b)(4). The taxpayer in *Pescosolido* argued that he consolidated several companies in which he was the sole owner with another company in which he was the principal shareholder "to permit him to retain control of and participate in the future growth" of the resulting company as well as "to 'freeze' the value of a portion of his equity stake in the corporation for estate planning purposes." *Id.* at 189. Additionally, the taxpayer argued that "he did not have the tax consequences of his charitable donations in mind at the time he made them." *Id.* at 190. The First Circuit stated that the Tax Court was free to disregard self-serving statements made by the taxpayer. *Id.* The First Circuit ultimately held that even though they did not doubt the sincerity of the taxpayer's motivations in his disposition of the stock, *id.* at 190, the Tax Court was not clearly erroneous in finding that avoidance of federal income tax was one of the principal purposes of the disposition. *Id.* at 189.

Applying the *Pescosolido* court's analysis to the current case, we find that the Tax Court did not err in finding that one of the purposes of petitioner's disposition of property was to avoid taxes. Even granting, as the *Pescosolido* court did, petitioner's contention that labor difficulties motivated petitioner's actions, we nonetheless find that tax avoidance was a principal consequence of petitioner's actions.

Finally, our conclusion is further supported by the Third Circuit's decision in

*Fireoved v. United States,* 462 F.2d 1281 (3d Cir.1972). In *Fireoved,* also a section 306 case, the district court "found that although one of the purposes involved in the issuance of the preferred stock dividend may have been business related, another principal purpose was the avoidance of Federal income tax." *Id.* at 1287. Because " 'one of the principal purposes' was motivated by 'tax avoidance[,]' " the Third Circuit held that "the district court did not err in refusing to apply the exception created by section 306(b)(4)(A)." *Id.*

AFFIRMED.