T.C. Memo. 1996-59

UNITED STATES TAX COURT

EARLE E. MURPHY, Petitioner <u>v</u>. COMMISSIONER
OF INTERNAL REVENUE, Respondent

Docket No. 18348-93.                   Filed February 15, 1996.

<u>John H. Lavelle</u>, for petitioner.

<u>Tracy A. Murphy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's 1988 Federal income tax and additions to tax as
follows:

| | Additions to Tax | | |
|---|---|---|---|
| Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | [1]Sec. 6653(g) |
| $343,253 | $15,446 | $9,352 | $187 |

---

[1]The statutory notice of deficiency and all documents filed by the parties have inadvertently referred to this addition to tax as imposed by sec. 6653(g). The addition to tax is actually imposed by sec. 6653(a)(1). Sec. 6653(g) merely prescribes special rules for the application of the addition to tax for underpayments resulting from the failure to show income reported on Forms 1099.

The issues for decision are: (1) Whether petitioner's receipt of money in exchange for his stock in Farmingdale Swim and Recreation Club, Inc. (FSRC), constituted a liquidating distribution; (2) whether petitioner had unreported interest income of $13,370; (3) whether petitioner is liable for additions to tax under section 6651(a)(1)[1] and (2) for failure to file a timely 1988 Federal income tax return and failure to timely pay his 1988 income tax liability; and (4) whether petitioner is liable for an addition to tax for negligence under section 6653(a)(1).

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner resided in Lake Placid, New York.

Petitioner incorporated FSRC in 1963. FSRC acquired land in Howell Township, New Jersey (the Township), upon which it operated a camping and recreational business, known as Deep Hollow Park. Business activities at Deep Hollow Park included selling swimming memberships, renting recreational vehicles, mobile homes, and trailers, and providing space for overnight camping. Petitioner owned 49 of the 50 initial outstanding shares of stock in FSRC, and petitioner's wife owned the remaining share.[2] The total number of shares outstanding eventually increased to 100.[3]

On June 16, 1980, the board of directors of FSRC approved a conditional purchase contract to purchase property adjacent to Deep Hollow Park. The contract was subject to the corporation's receiving the necessary approvals from the Township for its

-----

[2]In the mid-1970's, petitioner acquired his wife's share.

[3]Petitioner testified that by 1988, he had given 90 shares of FSRC stock to his daughters. However, he produced no documentation of the transfer, he never filed any gift tax returns with respect to the transfer of these shares, and he reported that he had received the entire 1988 liquidating distribution on his own return.

expansion as well as the receipt of a zoning variance. FSRC planned to operate the property as a fairgrounds.[4] On August 4, 1980, petitioner and Howard Long incorporated Deep Hollow Fairgrounds, Inc. (DHF), to facilitate and coordinate the operation of the new fairgrounds with FSRC. DHF also operated the recreational facilities at Deep Hollow Park, as well as certain other assets owned by FSRC. FSRC and DHF agreed to operate as a single entity and utilize a single corporate bank account, with DHF's taking title only to the new fairgrounds if and when the conditional purchase was completed.[5] All the other assets, including the Deep Hollow Park property and the corporate bank account, were considered the property of FSRC. Petitioner and Mr. Long each owned 50 percent of the stock of DHF.

In the 1970's, Howell Township began competing with Deep Hollow Park by creating parks, purchasing a lakefront beach, and adding swimming facilities, ball fields, and fairgrounds. The Township also offered free swimming lessons and bargain access to its facilities. In response to the competition, Deep Hollow Park expanded its business to offer festivals, circuses, fairs, rallies, and outdoor rock concerts (hereinafter collectively referred to as "concert business") under a "recreational use"

---

[4]This property will hereinafter be referred to as the "new fairgrounds".

[5]Unless otherwise indicated, the "single operating entity" consisting of FSRC and DHF will be referred to as Deep Hollow Park.

variance, which Deep Hollow Park had obtained from the Township in 1963.

The Township began an aggressive enforcement program against Deep Hollow Park, which resulted in continuous litigation and ultimately in an action by Deep Hollow Park against the Township for harassment. For example, the Township issued many citations against Deep Hollow Park for alleged violations of health, building, and other municipal codes. Many of these citations were subsequently overturned in municipal court actions. The Township also denied Deep Hollow Park's conditional use permit and site plan for the new fairgrounds, even though the Township was advised by its counsel that its ordinances were insufficient to deny the permits. This denial was subsequently overturned by the State Superior Court of New Jersey. In addition, the Township repeatedly attempted to disallow the use of Deep Hollow Park for concert business under its 1963 "recreational use" variance, and it retroactively amended its zoning ordinance to redefine "recreational use" to prohibit such activities.

In December 1985, while all these legal actions were pending, Shore Oaks, a local developer, announced plans to create a $50 million housing development and golf course on land adjacent to Deep Hollow Park. Because a portion of the proposed site was designated a protected wetlands area, it became necessary for Shore Oaks to acquire the Deep Hollow Park land in order to complete the project. In addition to acquiring Deep

Hollow Park, Shore Oaks would also need to obtain the necessary approvals from the Township.  Faced with the prospect of protracted litigation, petitioner, as an officer and agent of both FSRC and DHF, engaged in negotiations with Shore Oaks for the sale of the Deep Hollow Park property.  In the course of these negotiations, Shore Oaks asserted that Township officials strongly favored the golf course and that the Township was determined to eliminate Deep Hollow Park's concert business.  Nevertheless, neither petitioner nor the other shareholders of FSRC or DHF received any oral or written notice from a Township official that eminent domain or condemnation proceedings were being contemplated.  In mid-1988, FSRC sold the Deep Hollow Park property to Shore Oaks for $1,065,993.  The sale was recited in the minutes of a June 11, 1988, meeting of FSRC's board of directors, along with the following statement:  "Signed was [sic] the intent to disolve [sic] both the above corporations [referring to FSRC and DHF] to save taxes".

Prior to 1988, FSRC had acquired land in Lake Placid, New York, upon which it planned to construct a ski lodge and related recreational facilities.  In mid-1989, Lake Placid Recreation Co., Inc. (LPRC), was incorporated in New York.  The proceeds from the sale of the Deep Hollow Park property were reinvested through petitioner in LPRC.  The outstanding stock of LPRC was owned as follows:  Petitioner and Mr. Long each owned 1 share, and petitioner's six daughters each owned 15 shares.

On December 19, 1987, the board of directors of FSRC held a special meeting.  During this meeting, the board discussed the accountant's advice regarding the liquidation of both FSRC and DHF.  The minutes state that "Mark Lotts, accountant [for both FSRC and DHF] advised us to dissolve the corporation to save taxes".  Petitioner urged the creation of a New York corporation because of a plan to move business operations to New York.  The board decided, however, that FSRC would not be liquidated so as to preserve future legal actions against the Township.  The minutes state: "It was decided that until the Park and Fairground business was cleared up and construction was completed in Lake Placid, we would not dissolve the corporation and reorganize.  At which time all shares from the park and fairground will be transferred to the Lake Placid Corporation."

The shareholders and board members of FSRC and DHF held a special meeting on March 18, 1988.  The minutes state that "The Corporation's accountants have advised us to disolve [sic] the corporations, reasoning [sic] being to save money on capital gains and save on double taxation".  The minutes also state that "A new corporation would be formed in the State of New York and the old corporations will be disolved [sic]."

On March 28, 1988, petitioner signed several standard statements prepared by the corporations' accountant referring to resolutions adopting a plan of complete liquidation and dissolution for both FSRC and DHF for attachment to the

corporations' 1988 Federal income tax returns. These statements were entitled "Statement Re Liquidation Under IRC Section 337" and contained the following representations: (1) A statement that the board of directors adopted a resolution recommending the complete liquidation and dissolution of each corporation in accordance with "the Plan"; (2) a statement authorizing and directing the holding of a special meeting of the shareholders to vote on the Plan; (3) a statement that, following shareholder adoption, the corporation will cease doing business and will sell its assets, discharge its liabilities, and distribute the residue pro rata to the shareholders; and (4) a statement that each corporation was to be dissolved as soon thereafter as practicable.

Petitioner filed a Form 966 (Corporate Dissolution or Liquidation) for DHF but did not file a Form 966 for FSRC. The certificate of dissolution for FSRC was filed on July 6, 1989. LPRC paid the dissolution fee of FSRC. At trial, petitioner conceded that he intended to liquidate DHF.

The 1988 Federal income tax returns for FSRC and DHF report the sale of Deep Hollow Park property and the complete liquidation of FSRC and DHF. FSRC and DHF each filed a Form 1099 for taxable year 1988 reporting a liquidating distribution to petitioner in the amount of $1,206,351 and $2,943, respectively. Neither corporation filed an amended return for that year. Petitioner timely filed a Form 4868 (Application for Automatic

Extension of Time to File U.S. Individual Income Tax Return) with respect to the taxable year 1988, which automatically extended petitioner's filing deadline until August 15, 1989.  Petitioner did not mail the return until September 2, 1989.  Petitioner's original individual income tax return for 1988 reported petitioner's receipt of these liquidating distributions. Petitioner's stock bases, as reported by him on his Schedule D for 1988, were $6,225 in FSRC and $1,000 in DHF.  Petitioner also reported $97 in interest income on his original return.  Neither FSRC nor DHF reported any interest income on their 1988 income tax returns.  The Internal Revenue Service's records indicate, however, that petitioner received several Forms 1099-INT, which state that he received interest income in the total amount of $13,467.[6]

On March 5, 1991, petitioner filed an amended return for the 1988 taxable year.  On his amended return, petitioner reported total income in the amount of $41,570.  This amount reflects $30,000 in business income and two items petitioner reported on his original return:  (1) $97 of interest income, and (2) $11,473

---

[6]The $13,467 figure represents the $97 that petitioner reported on his income tax return, plus the $13,370 interest determined to be income to petitioner in the statutory notice of deficiency.  Paragraph 6 of the stipulation of facts incorrectly states that the Service's records reflect a total interest figure of $13,346.  Petitioner did not object to the correction of this error.

in pension income.  On his amended return, petitioner did not report any liquidating distributions or capital gains.

OPINION

On Schedule D of his 1988 Federal income tax return, petitioner reported that he received distributions from FSRC and DHF in complete liquidation of both corporations.  However, petitioner later filed an amended tax return for 1988, which reflected petitioner's new reporting position that the amounts received from FSRC and DHF by petitioner did not constitute liquidating distributions.  Respondent determined that FSRC and DHF were liquidated prior to January 1, 1989, and that the distributions from each corporation were taxable to petitioner to the extent they exceeded petitioner's adjusted stock basis.  Because petitioner conceded that he intended to liquidate DHF, we will focus only upon whether petitioner received a liquidating distribution from FSRC.  Petitioner argues that he never intended to liquidate FSRC and that his characterization of the amount received from FSRC as a liquidating distribution on his tax return was an error.  Respondent's determination is presumed correct, and petitioner bears the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 331(a) provides that "Amounts received by a shareholder in a distribution in complete liquidation of a corporation shall be treated as in full payment in exchange for

the stock."  Prior to the Tax Reform Act of 1986, section 337 provided that  "If, within the 12-month period beginning on the date on which a corporation adopts a plan of complete liquidation, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period."  Sec. 337(a).  This nonrecognition provision was repealed by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 631(a), 100 Stat. 2085, 2269.  However, a transitional rule permitted certain small corporations to be eligible for section 337 nonrecognition if they distributed their assets in complete liquidation before January 1, 1989.  Both FSRC and DHF satisfied the eligibility requirements for this transitional provision. See Id., sec. 633(d)(1), 100 Stat. at 2278.

     The terms "liquidation" or "complete liquidation" are not defined in section 331 or in the regulations thereunder. However, related section 1.332-2(c), Income Tax Regs., offers the following standard:

       A status of liquidation exists when the corporation
       ceases to be a going concern and its activities are
       merely for the purpose of winding up its affairs,
       paying its debts, and distributing any remaining
       balance to its shareholders.  * * *

See also Wood v. Commissioner, 27 B.T.A. 162, 166-167 (1932) (applying a similar definition).  Whether a corporation has

liquidated is a question of fact. Id. at 167; Olmsted v. Commissioner, T.C. Memo. 1984-381. In determining whether a corporation has liquidated, this Court has applied a three-part test: (1) Whether there is a manifest intent to liquidate; (2) whether there is a continuing purpose to terminate corporate affairs and dissolve the corporation; and (3) whether the corporation's activities are directed to such termination. Estate of Maguire v. Commissioner, 50 T.C. 130, 142 (1968); T.T. Word Supply Co. v. Commissioner, 41 B.T.A. 965, 980-981 (1940); Wood v. Commissioner, supra at 166-167; Olmsted v. Commissioner, supra. After reviewing the evidence, we are convinced that FSRC was liquidated prior to the end of 1988.

First, the record in this case clearly supports a finding of an intent to liquidate FSRC. Specifically, contemporaneous corporate minutes from meetings of FSRC's board of directors demonstrate that it was the intent of the board to liquidate. The minutes of the December 19, 1987, board meeting set forth the board's decision not to dissolve FSRC until matters were resolved with the Township and construction was completed in Lake Placid. It is clear from this decision that the board intended that FSRC's activities be merely for the purpose of winding up its affairs. The minutes of the March 18, 1988, board meeting recount the advice of the accountant to liquidate FSRC to avoid double taxation and produce capital gains at the shareholder level upon receipt of the liquidating distributions. These

minutes contain the following statement: "A new corporation would be formed in the State of New York and the old corporations will be dissolved." The minutes of the June 11, 1988, meeting state: "Signed was [sic] the intent to disolve [sic] both the above corporations to save taxes." In addition, petitioner's individual return for 1988 and FSRC's corporate return indicate that this intent was actually carried out. Furthermore, under identical circumstances, petitioner has conceded that he intended to liquidate DHF. Second, FSRC had a continuing purpose to liquidate; i.e., its long-running feud with Howell Township made it exceedingly difficult for FSRC to continue with its business. Finally, FSRC's actions, including selling corporate property, filing final returns, making liquidating distributions, and dissolving under state law, all unequivocally demonstrate that the corporation's activities were directed and confined to liquidating the corporation.

Although he originally reported the transactions at issue as liquidations, petitioner now seeks to disavow his original form. Taxpayers are free to structure their transactions in a manner that will result in their owing the least amount of tax possible. This is the essence of effective tax planning. However, as the Supreme Court observed in Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974):

> [W]hile a taxpayer is free to organize his affairs as
> he chooses, nevertheless, once having done so, he must

accept the tax consequences of his choice * * * and may
not the enjoy the benefit of some other route he might
have chosen to follow but did not.  * * *  [Citations
omitted.]

See also Higgins v. Smith, 308 U.S. 473, 477 (1940); Estate of
Durkin v. Commissioner, 99 T.C. 561, 571 (1992).  "It would be
quite intolerable to pyramid the existing complexities of tax law
by a rule that the tax shall be that resulting from the form of
transaction taxpayers have chosen or from any other form they
might have chosen, whichever is less."  Television Indus., Inc.
v. Commissioner, 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C.
1297 (1959).  We have observed that "the taxpayer may have less
freedom than the Commissioner to ignore the transactional form
that he has adopted."  Illinois Power Co. v. Commissioner, 87
T.C. 1417, 1430 (1986) (quoting Bolger v. Commissioner, 59 T.C.
760, 767 n.4 (1973)).

Petitioner contends that the corporate minutes from FSRC's
board meetings clearly indicate that petitioner intended to
reorganize the New Jersey business operations in Lake Placid.
The only reference to a reorganization is in the minutes of the
December 19, 1987, shareholders meeting, which state, in
pertinent part, that "until the Park and Fairground business was
cleared up and construction was completed in Lake Placid, we
would not dissolve the corporation and reorganize.  At which time
[presumably when the Lake Placid development is completed] all
shares from the park and fairground will be transferred to the

Lake Placid Corporation."  However, minutes from meetings on March 18 and June 11, 1988, make it clear that any future plans of a reorganization were abandoned when the board decided to follow the recommendation of Mr. Lotts, FSRC's accountant, and liquidate in order to benefit from the transitional provisions for small corporations in the Tax Reform Act of 1986.

Petitioner argues that he did not understand his accountant's advice.  Petitioner contends that he first learned that Mr. Lotts had treated the transaction as a liquidation upon receiving his 1988 Federal income tax return for filing. Petitioner blames this mischaracterization of the transaction on a lack of effective communication, Mr. Lotts' "urgency to liquidate", and the fact that Mr. Lotts was unaware of petitioner's intent to reorganize.  However, the record reflects that petitioner is a well-educated individual who ran a successful business for many years.

There is nothing in the record, other than petitioner's self-serving testimony, to indicate that Mr. Lotts did not follow petitioner's instructions while preparing both his individual and FSRC's corporate returns.  Petitioner did not call Mr. Lotts to testify about his tax advice or the circumstances surrounding the preparation of petitioner's individual return or FSRC's corporate return.  Moreover, the record reflects that as early as December 19, 1987, Mr. Lotts advised FSRC's board to liquidate, and that on June 11, 1988, petitioner signed forms reporting the

corporation's intent to do so. Petitioner did not file his amended return until March 5, 1991. Against this backdrop, it is difficult to believe that petitioner did not intend to liquidate FSRC. Rather, it appears that petitioner was searching for a way to avoid the shareholder-level tax consequences of his decision to liquidate and that his decision to file an amended return is nothing more than ex post facto tax planning.

Accordingly, we find that petitioner liquidated FSRC in 1988. Having chosen to do so, petitioner must now accept the tax consequences of his choice. Therefore, we sustain respondent's determination that petitioner has long term capital gain to the extent that the distribution he received exceeds his adjusted basis in his stock. See secs. 331(a); 1001(a).

Petitioner argues that the transfer of FSRC's assets to LPRC and its dissolution qualified as a tax-free reorganization under section 368(a)(1). Having just determined that there was a complete liquidation of FSRC, it necessarily follows that the transaction cannot qualify as a reorganization under the provisions of 368(a)(1), because a "liquidation is the antithesis of reorganization." Mascot Stove Co. v. Commissioner, 120 F.2d 153, 156 (6th Cir. 1941) (emphasis added), affg. 40 B.T.A. 1057 (1939). Moreover, in order to qualify for tax-free treatment, a shareholder must exchange his or her stock pursuant to a plan of reorganization. Sec. 354(a)(1). The requirement of a plan of reorganization "is to be taken as limiting the nonrecognition of

gain or loss to such exchanges or distributions as are directly a part of the transaction specifically described as a reorganization in section 368(a)." Sec. 1.368-2(g), Income Tax Regs. Rather than pointing to a plan of reorganization, the evidence clearly indicates that FSRC adopted a plan of complete liquidation.

Alternatively, petitioner contends that the transaction qualifies for nonrecognition treatment under the involuntary conversion provisions of section 1033. Section 1033 provides for nonrecognition of gain if property is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted. Sec. 1033(a)(1). Included within this provision is property that is taken by the Government by condemnation or that is sold by the taxpayer pursuant to the threat or imminence of condemnation. Sec. 1033(a).

In order to qualify for nonrecognition treatment, however, the taxpayer must have owned the property that was involuntarily converted. In Fuchs v. Commissioner, 80 T.C. 506, 511 (1983), we explained that "We have held previously that in the case of a partnership, the election under section 1033 can be made only by the partnership and not by the partners, individually." We see no reason for a different result in the context of a corporation and its shareholders. It is clear that FSRC owned Deep Hollow Park. Therefore, although petitioner received all the corporate

assets in a liquidating distribution, he is not entitled to elect nonrecognition treatment under section 1033.[7]

Respondent also determined that petitioner had additional interest income of $13,370. Gross income includes interest income. Sec. 61(a)(4). On both his original and amended returns, petitioner reported only $97 of interest income. Petitioner's sole argument is that the interest income was received by petitioner in his fiduciary capacity as an agent for FSRC and, thus, was properly reportable by FSRC and not by petitioner. The only evidence introduced by petitioner to support this argument is his self-serving testimony that he opened several bank accounts on behalf of FSRC and DHF. However, petitioner did not even identify these accounts. Neither FSRC

---

[7]Even if petitioner were acting as an agent of FSRC with the intention of completing a sec. 1033 transaction, we still believe that the provisions of sec. 1033 are inapplicable under these facts. A threat of condemnation sufficient to invoke provisions of sec. 1033 exists when a representative of a governmental body or a public official authorized to acquire property for public use informs the taxpayer, either orally or in writing, that such body or such official has decided to acquire the taxpayer's property. Tecumseh Corrugated Box Co. v. Commissioner, 94 T.C. 360, 376 (1990), affd. 932 F.2d 526 (6th Cir. 1991); Rainier Co. v. Commissioner, 61 T.C. 68, 76 (1973), revd. on another issue by unpublished order 538 F.2d 338 (9th Cir. 1975). The property owner must also reasonably believe that condemnation will occur if the owner does not sell the property voluntarily to a third party. Id. In the instant case, the parties have stipulated that "Neither petitioner nor the shareholders of FSRC or DHF received any oral or written notice from a township official that eminent domain or condemnation proceedings were contemplated." Since petitioner received no communication from Howell Township officials regarding the possibility of condemnation of the Deep Hollow Park property, we are not persuaded that the property was sold under threat of condemnation, and sec. 1033 is unavailable.

nor DHF reported any interest income for 1988.  We find that petitioner has not met his burden of proof on this issue.  See Rule 142(a).  Therefore, we sustain respondent's determination.

The next issue we must decide is whether petitioner is liable for additions to tax pursuant to section 6651(a)(1) and (2).  Section 6651(a)(1) imposes an addition to tax for failure to timely file a tax return, unless the taxpayer establishes that the failure to file was due to reasonable cause and not willful neglect.  Section 6651(a)(2) imposes an addition to tax for failure to timely pay a tax liability shown upon a return, unless the taxpayer establishes that the failure was due to reasonable cause and not willful neglect.

Petitioner received an automatic extension to file his 1988 return on or before August 15, 1989.  Petitioner did not meet this deadline, as he did not mail his return until September 2, 1989.  At the time that he filed, petitioner failed to include full payment of his reported income tax liability.  On brief, petitioner argues that he had no income tax liability for 1988, because no liquidation occurred, and petitioner was simply an agent of FSRC with respect to the sales proceeds reinvested in LPRC.  We have already concluded, however, that a liquidation, in fact, occurred and that petitioner has income to the extent that the distribution exceeds the adjusted basis in petitioner's stock.  Moreover, petitioner has not introduced any evidence that

he satisfies the "reasonable cause" exception of section 6651(a)(1).  Accordingly, we sustain respondent's determination.

Respondent also determined that petitioner is liable for the addition to tax pursuant to section 6653(a).  Section 6653(a)(1) provides that if any part of an underpayment of tax required to be shown on a return is due to negligence, there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a)(3) defines negligence to include "any failure to make a reasonable attempt to comply with the provisions of this title".  We have similarly defined negligence as the failure to exercise the due care of a reasonable and ordinarily prudent person under like circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  If a taxpayer fails to show amounts reported on Forms 1099, section 6653(g) provides that such a failure shall be treated as due to negligence for purposes of section 6653(a), unless the taxpayer establishes the contrary by clear and convincing evidence.  Sec. 6653(g)(2).

Petitioner failed to include in income $13,370 of interest that was reported on Forms 1099-INT.  Petitioner has not proven by clear and convincing evidence that such failure was not negligent.  Therefore, we sustain respondent's determination.

Decision will be entered

for respondent.